## Miller, et al. v. Ferrell, et al.

(Decided June 2, 1922.)

### Appeal from Wayne Circuit Court.

Appeal and Error—Cancellation of Instruments—Mental Capacity. —The chancellor's judgment sustaining a deed executed by a man who was 74 years of age and paralyzed, by which for $30,000.00 he conveyed 4,000 acres of land and the royalties due after his death from producing oil wells thereon, reversed and the deed cancelled upon a review of the evidence held to prove mental incapacity of the grantor and inadequacy of price.

BERTRAM & BERTRAM, J. M. KENNEDY and JAMES DENTON for appellants.

WM. WADDLE, BEN L. WADDLE, BEN V. SMITH & SON, DUNCAN & BELL and J. P. HARRISON for appellees.

OPINION OF THE COURT BY JUDGE CLARKE—Reversing.

On October 11th, 1917, Marion Miller conveyed to appellees, Ferrell, Tate, Hill and Stratemeyer, four tracts of land containing, after deducting exclusions, about 4,000 acres, in consideration of $30,000.00, but reserving to himself for life all royalties accruing for oil being produced upon the land. $2,000.00 of the purchase price was paid in cash, and for the balance interest bearing notes secured by lien were executed by the grantees, due $5,000.00 in six months; $1,500.00 to be paid out of the proceeds of sales of timber on the land but within five years, and $8,000.00 due in five years.

On December 3rd, 1917, Miller conveyed to the same grantees for $1.00, a small tract of land known as the Sumpter Store House tract, which the deed recites was inadvertently omitted from the former conveyance.

On January 5th, 1918, Miller conveyed to appellees Fayette C. Miller, his cousin, and Robert Hurst, her nephew, all other property owned by him and the royalties reserved for his life in the deeds to Ferrell, &c., although he had previously transferred these royalties to Hurst alone, in consideration of their agreement to care for and provide him with necessary clothes and provisions for life.

On October 12th, 1917, the next day after the execution of the deed to them, Ferrell, Tate, Hill and Stratemeyer, by an *inter partes* deed conveyed all of the timber 14-inches and over in diameter, on the land, to Hill and

Stratemeyer and the balance of the fee to Ferrell and Tate, the former assuming payment of the $15,000.00 note and the latter agreeing to pay the $2,000.00 cash and the $5,000.00 and $8,000.00 notes to Miller.

On January 7th, 1918, Hill and Stratemeyer conveyed the timber to the Stratemeyer Lumber Company; and between November 13th, 1918, and February 19th, 1919, Ferrell and Tate conveyed certain portions of the land to W. A. Young, the Wood Oil Co., Lige Coffey, Ahiel Slagel, Wm. Slagel, J. H. Edwards and F. C. Miller.

Marion Miller died intestate in October, 1919, and on May 21st, 1920, his heirs at law instituted this action to set aside all of the above mentioned conveyances (except the deed of January 5th, 1918, to Fayette C. Miller, which is attacked in another suit), upon the ground that Marion Miller did not have sufficient mental capacity to make the deeds to Ferrell, &c.; that same were procured by fraud and undue influence, and that the consideration therefor was grossly inadequate.

Upon a trial without a jury, the chancellor decided each of these issues of fact against plaintiffs, and dismissed their petition.

As there is and could be no serious difference of opinion as to the law applicable when the facts are ascertained, the questions involved on this appeal by the plaintiffs are purely questions of fact, and these are most vigorously contested.

The record is very voluminous, and nearly all of the more than 140 witnesses, of whom some seven or eight are physicians, gave their opinions of the mental capacity of Marion Miller, varying all the way from idiocy to perfect sanity. It is not contended however for plaintiffs that he was entirely devoid of mentality, but it is conceded that his mind was not entirely destroyed by the stroke of paralysis he suffered about twenty-four years before his death, which unquestionably rendered him a physical wreck the balance of his life. Just what effect this paralysis, from which he never recovered appreciably after the first two or three weeks either mentally or physically, had upon his capacity to understand and transact business affairs, and whether or not the deeds to appellees, as well as the business transacted in his name after A. Miller's death, were in truth his conscious acts, are the vital questions presented, in the decision of which

the price and terms of the sale to appellees are most important factors.

Before considering the evidence bearing directly upon that question, it will be necessary to recite at some length the undisputed facts which are important to an understanding and correct evaluation of that evidence.

About 1877 Marion Miller and his two brothers, Armistead and Fox Miller, jointly acquired title to most of the land here involved, either by devise from their father or by inheritance and purchase from his other heirs which is unimportant, and these three brothers with their mother continued to live upon the land in the old home established by their father many years theretofore, until the death of the mother in 1887.

At about the time of her death, Fox Miller sold and conveyed his undivided one-third interest in the land to his two brothers, moved out of the state and has not since resided therein. Neither of these two brothers ever married, and they jointly conducted a large business both in connection with and independent of their farming operations, under the partnership name of A. & M. Miller, until the death of Armistead in 1911.

In 1878 Fayette C. Miller, having lost her parents and being a first cousin of the three Miller brothers, came to live with them and their mother.

In 1901 Robert Hurst, a nephew of Fayette C. Miller, and second cousin of A. & M. Miller, lost his parents and came to make his home with the Millers. In 1915 M. Miller, Fayette Miller and Hurst left the farm and moved to a house in Monticello, owned by M. Miller, where they continued to live together as one family until his death in 1919.

Prior to his paralysis in 1896, M. Miller looked after the stock and farming operation principally, and A. Miller attended to the stores, distillery and other activities of the firm, but all business with an unimportant exception, was jointly owned and conducted under the firm name of A. & M. Miller, and the business was owned and conducted in the same way after Marion's affliction, except that he no longer had any active part in its management, all of which was looked after by A. Miller.

When A. Miller died in 1911 he left a will, executed some time after Marion's paralysis, in which the latter was named as chief beneficiary and sole executor, but he never qualified or acted as executor, and Eli Bell, a

lawyer frequently employed by the firm, was appointed, qualified and acted as administrator with the will annexed, in the settlement of his estate.

The will of A. Miller was contested by these plaintiffs, or a part of them, upon the grounds of mental incapacity and undue influence, but same was sustained except a codicil dated a few days before his death. See Coffey v. Miller, 160 Ky. 415, 169 S. W. 852.

A suit was later filed to settle the estate of A. Miller in the name of M. Miller and others, in which all of the land jointly owned by A. & M. Miller was ordered sold, and at that sale M. Miller became the purchaser at the price of $56,000.00, for which he executed bonds with surety. The land was conveyed to M. Miller by commissioner's deed after these bonds had been satisfied, which was accomplished as follows: The then merchantable white oak and hickory timber on the land was sold at once for about $30,000.00, which was paid upon the purchase money bonds, and same were also credited with $10,000.00 devised by A. Miller to Fayette C. Miller, and an additional $2,500.00 furnished by her which she had accumulated during the time she had been living in the Miller home. M. Miller's one-half interest in the property, with that devised to him by A. Miller, was more than sufficient to take care of the balance of the purchase money bonds.

This sale included the land involved here as well as that conveyed by M. Miller to Fayette Miller and Robt. Hurst, and was made by the master commissioner at the court house door, after due advertisement, in May, 1914, or about three and one-half years before the conveyance to appellees.

Although all of this, and much other business, was transacted in the name of M. Miller, no formal question was ever made as to his mental capacity until the spring of 1917, or about six months before the execution of the deed to appellees, when an unsuccessful effort was made by some of plaintiffs to have a committee appointed to manage his affairs.

He was 74 years of age when he died, and the opinion evidence of non-experts, as well as experts, is about equally divided numerically, but with the advantage slightly in favor of appellees, as to whether or not he had sufficient mental capacity to understand or perform a business transaction of any consequence, and especially one of the magnitude of his conveyance to appellees.

It is however a familiar rule that such evidence, except as based upon recited facts supporting the opinions expressed, is of but little or no probative value, and it is therefore to these facts that we must look almost exclusively in reaching our conclusions.

The paralysis affected Mr. Miller's entire right side, and left him helpless and speechless for a few weeks. He never regained the use of his right arm or leg, but in a short time he could get about the house and yard with a crutch and later with a cane, and he soon got so he could utter a few words, but never so he could form a sentence. Except for such improvements as came almost immediately after the paralysis, both his mental and physical condition remained about the same throughout the twenty odd years he lived thereafter, except for a short time just before his death. The words he usually employed were "Nigger-like," "Back on yonder," "Yes," "No," "By golly" and the names of those he knew well, but as related by all the witnesses, these did not exceed about forty in number.

Most of the witnesses for appellants heard him use only a few of these words, and they were unable to understand him. It is from these facts, his facial expression, behavior and the isolated way in which he lived that they base their opinions that though not entirely devoid of mind, he did not have sufficient mental capacity to transact any business except of the simplest kinds, while some of them add that he had the expression of an idiot or a blank stare, and that they did not think he had any mind at all, or at most but the mind of a small child.

All witnesses agree that after his paralysis he had not been upon, or seen much if any of his land except such as was visible from the house and road; that he never left home by himself or actively participated in business affairs of any kind alone, or attempted any but the simplest affairs without the presence and help of Robt. Hurst, who ran his farm, Eli Bell, his legal adviser, or Fayette C. Miller, his housekeeper. This is admitted by Robt. Hurst and Fayette Miller (the strongest witnesses for appellees, except possibly Eli Bell), who were with him constantly and who with defendants' other witnesses, testify that by such words as he could utter and the signs he employed they could understand him, and that he had a remarkably clear intellect and ample ability to transact any and all kinds of business.

Hurst says that in the eighteen years he lived with Mr. Miller, the only business transaction he ever knew him to consummate alone was the purchase of a horse, and that the price paid was reasonable. Miss Miller, who was his constant companion during the entire period of his affliction, says she only knew of his purchasing or trading for some pigs and a heifer or two without assistance, and these were trades with her. Other witnesses tell of a few even more simple things done by him alone. Nearly all witnesses agree that he usually uttered such words as he could employ in couplets, such as "Yes, yes," No, no," "Rooster, rooster," "Whiskey, whiskey," etc., and that he used freely the words of profanity at his command, and intoxicants whenever he could obtain them, which was not often.

In spite of all this testimony, and more which certainly supplies facts upon which to base an opinion, counsel for appellees express a doubt whether there was in fact any evidence to support appellants' contention that Miller did not have sufficient mind to understand and make the deed to 4,000 acres of land, which he had not been over and most of which he had not seen for 21 years, for $30,000.00. They do not, of course, insist upon this for an affirmance, but rather upon the claim that the evidence sustains, or at least is not palpably against the chancellor's finding that Miller was competent to make the deed, and the price was adequate.

There is much evidence calculated to induce the belief that Miller had such capacity, and if it were not for the facts as we gather them from the evidence with reference to this particular trade, we might possibly be able to affirm the chancellor's judgment, since many reputable and disinterested witnesses stated that from their observations of and transactions with Miller they believed he was sound of mind; that his expression was intelligent and his answers by words and signs were intelligible and understood by them; that he evinced a thorough knowledge of his property, and an ability to trade and manage his affairs properly and profitably.

Two facts proven are especially relied upon by appellees. These are that A. Miller, in his will executed in 1908, named his brother M. Miller as sole executor of his large and involved estate, and that Fox Miller, the only surviving member of the family, upon an inquest as to the sanity of M. Miller in the spring of 1917, only about

six months before the execution of the deed attacked herein, testified that he had sufficient capacity to manage his affairs and was sound of mind. These are of course very strong circumstances in favor of appellees, but the first is very much weakened by the fact that M. Miller did not qualify or attempt to act as executor, and his brother must have known he could not do so on account of his physical condition even if he believed he had sufficient mental capacity; while the changed conditions under which Fox Miller gave his testimony upon the last occasion, explains even if it does not justify his changed opinion as to the strength of his brother's mind.

At the inquest, when Fox Miller testified his brother was of sound mind, an effort was being made by nephews, with whom neither was very friendly, to have a committee take the management of his business away from him at a time when apparently he had the loyal assistance of Robt. Hurst and Fayette Miller in the conservation of his estate. At the trial of this case, he had to view his brother's capacity to take care of himself when he was disposing of everything he had on earth, a part of it to Robt. Hurst and Fayette Miller for personal attention simply for the rest of his life, then necessarily near its end, and the balance at a price he considered grossly inadequate to strangers who had agreed in advance, before Fayette Miller would consent to the trade, that she might purchase from them a considerable part of the land.

Added to this is the further fact that Fox Miller was offered, in the name of M. Miller, $2,000.00 to come from his home in Texas and testify for him at the inquest. He might very naturally have believed his brother, of whom he had seen but little since his paralysis, having visited him but three times, had mind enough despite his afflictions to manage his affairs so long as they were being managed successfully by himself and those about him; and then, as reasonably, conclude he did not have such capacity when he saw the whole estate dissipated almost overnight for an inadequate consideration, and even that going to those about him who theretofore had been loyal to his interests.

Nothing whatever had occurred previous to this time to test his capacity to look out for his own interests, since he had done nothing except direct or acquiesce in a management by others through which his interests were

being conserved, but now that management had become inimical to his interests, and as soon as it did, the property passed from him largely to his managers, and in the process he suddenly became almost a pauper instead of a very wealthy man. .

If, therefore, as it very naturally appeared to Fox Miller, his brother's interests were sacrificed for the benefit of strangers and for Robt. Hurst and Fayette Miller, whom he had befriended at least as much as they had him, in the sale to appellees and gifts which practically attended it, that fact not only justified his changed opinion of his brother's capacity, but tends strongly to prove that his certain infirmities were not merely physical as appellees contend, but mental as well, as appellants insist.

Before turning to his transaction upon which, in our judgment, the case finally turns, we desire to call attention more particularly than we have done so far to the inquest held in the spring before the deeds were executed to appellees by Mr. Miller. The efforts of the Commonwealth to have M. Miller appear at that trial were resisted most stubbornly by his counsel, and he was finally produced to the jury and court officials in an anteroom only after opposing counsel had agreed that he would not be questioned by them. But when he appeared he was questioned by members of the jury, and five of the six jurors, the county judge and sheriff, all testified on this trial that from that examination, his appearance and behavior, they did not think he was mentally competent. The other juror, who presumably hung the jury at the inquest, did not testify. After that jury failed to agree, and the county judge had refused to require Mr. Miller's attendance at another trial, the proceedings were dismissed without an adjudication either way.

The sale to appellees was conducted for Mr. Miller by his attorney, Eli Bell, who at least appears disinterested and entirely frank, and who testified that his mind was good, that he could understand him perfectly well, and that by means of words and signs decedent told him to sell the property and fixed the price.

Miller's grantees knew of the effort to have a committee appointed for Mr. Miller and that some of his relatives were claiming he was incompetent before they purchased the property, and although they passed by the house where he lived when they went to look at the land

with a view of purchasing it, they did not go to see him or have any conversation with him to ascertain either his wishes or his mental condition, but accepted the assurance of Mr. Bell that he desired to sell and was competent to make a deed.

Witnesses for appellees state simply that the price paid for the land was adequate, while witnesses for appellants valued it at from $75,000.00 to $150,000.00. In less than two months after the sale to appellees, they sold the timber and 790 acres of the land for $36,550.00, or $6,550.00 more than they paid for the whole, and had left about 3,200 acres of land besides the exceedingly valuable royalties from a large number of producing oil wells, the latter subject however to the life estate retained by Miller, which he almost immediately gave to Hurst and Fayette Miller.

Fayette Miller bought this 790 acres of land, without any timber that may have been on it, for $21,550.00, and she surely, if anyone, knew its worth. In payment therefor she assigned to Miller's grantees the $8,000.00 note and most of the $15,000.00 note they had executed to him for the whole property. These notes, Eli Bell testifies, were transferred to her by Miller, partly as a gift and in payment of the $12,500.00 she had loaned him when he bought the land at the sale to settle A. Miller's estate, and this no one denies.

Within a little over a year, the grantees in addition to the 790 acres they sold Fayette Miller, made the following sales: W. A. Young, 700 acres for $3,500.00; Slagels, 200 acres for $2,500.00; Edwards, 100 acres for $400.00; Coffey, 42 acres for $300.00; Wood Oil Co. 25 acres for $300.00. So that in less than sixteen months after acquiring title to the 4,000 acres for $30,000.00, they sold the timber and 1,857 acres for $43,550.00 and still had left 2,143 acres of land and the remainder interest in the producing oil wells on the land.

The timber that was allotted to Hill and Stratemeyer in the partition between them and Ferrell and Tate at $15,000.00, and at which price we have reckoned it in the above summary, they proved upon a hearing for an injunction herein to prevent them from cutting and removing it, was worth an enormous sum. They showed that they had already removed about 2,000,000 feet; that there yet remained standing about 4,000,000 feet, and they allege in their affidavits that if restrained from re-

moving it, they would suffer damages in the sum of $350,-
000.00. Making due allowance for extravagance in
estimating their probable damage, this testimony from
them is harder to reconcile with their later testimony
upon the final hearing of the same case, that all the tim-
ber was worth less than the $15,000.00 Hill and Strate-
meyer paid for it, than is that of Fox Miller upon the two
occasions he testified as to his brothers' mental capacity.

There are many other incidents that might be stated,
some favorable to one side and some to the other, but
these are the main facts, and from a very careful con-
sideration of the entire record we find ourselves quite
unable to agree with the judgment of the chancellor,
either as to the mental capacity of Mr. Miller or the ade-
quacy of the purchase price.

Upon the question of undue influence, there is no
direct evidence, and none whatever except such as might
reasonably be inferred from the circumstances attend-
ing the sale, the price and terms upon which it was
made, considered in connection with the fact that Fayette
Miller, almost immediately after the sale, got such por-
tions of the farm as she wanted from the grantees, pur-
suant to an agreement she exacted before she would con-
sent to the sale, and without which it could not have been
consummated; paid for same almost entirely with notes
that the grantees had executed to the grantor for the
whole property, and immediately conveyed one-half
thereof to Hurst by deed which was not recorded.

The argument for appellees that Mr. Miller, as a
sensible man, aware of his obligations and duties to his
relatives, was fully justified in so disposing of his prop-
erty before his death as to give all of it to his more dis-
tant relatives, Miss Miller and Hurst, and leave nothing
for his heirs, because of the faithful service of the former
and his reasonable dislike for the latter, is untenable
since his heirs included his brother, Fox Miller, the sole
surviving member of his immediate family, who had
never, so far as this record discloses, incurred his dis-
pleasure, but upon the other hand had come to his rescue
when his other heirs were attempting to have him ad-
judged incompetent to manage his own affairs.

This record shows, moreover, not only that decedent
had reason to be but that he was very much attached to
his brother. He was an old man without means, and his
condition would naturally have appealed most strongly

to his affections and sense of justice in any conscious disposition of his property.

That this brother was entirely lost sight of in the final distribution of M. Miller's large estate, of which the deeds to appellees were but a preliminary part, is strongly indicative, when considered in the light of his afflictions and age, that he did not have intelligent understanding of what he was doing.

It is therefore our conviction that the evidence is contrary to and does not sustain the chancellor's findings of fact, and his judgment based thereon must be reversed.

For the $12,500.00 which Fayette C. Miller furnished M. Miller to pay on the land when he bought same in the settlement of A. Miller's estate and which was so used, she is entitled to a lien upon the entire tract and interest, upon a cancellation of his deed and his grantees' deeds to her by which same was repaid to her; and this right will be protected by the chancellor in the equitable adjustments that will be necessary between her and her immediate grantors, and between them and plaintiffs.

Other adjustments rendered necessary by the cancellation of the deeds of M. Miller can not be adjudged on this record, since the case was fully prepared with reference to the validity of M. Miller's deeds only; and upon a return of the case to the lower court, the parties will be permitted to plead and take proof with reference to all questions presented by the cancellation of his deeds.

Wherefore the judgment is reversed and the cause remanded for proceedings consistent herewith.