## HAGER v. PACIFIC MUT. LIFE INS. CO.
### No. 8.

District Court, E. D. Kentucky, Catlettsburg.
Jan. 28, 1942.

Ray Holbrook, of Ashland, Ky., and Clyde L. Miller, of Louisa, Ky., for plaintiff.

William Marshall Bullitt, Leo T. Wolford, and Eugene B. Cochran (all of Bruce & Bullitt), of Louisville, Ky., for defendant.

SWINFORD, District Judge.

This is an action to reinstate and recover the disability benefits on three insurance policies issued to the plaintiff by the immediate predecessor of the defendant.

The defendant is the successor to the Pacific Mutual Life Insurance Company of California through reorganization proceedings (Carpenter v. Pacific Mutual Life, 10 Cal.2d 307, 74 P.2d 761); Neblett v. Carpenter, 305 U.S. 297, 59 S.Ct. 170, 83 L.Ed. 182. The defendant will be referred to as the New Company and its predecessor as the Old Company.

The Old Company issued to the plaintiff the following three policies on the dates indicated: (1) a $5,000 twenty-pay life insurance policy No. 465599, on August 7, 1922; (2) a $5,000 ordinary life insurance policy No. 551756, on August 21, 1924; and (3) a non-cancellable income policy (referred to as the non-can policy) No. 5502713, on November 19, 1926.

The plaintiff was a business man in Ashland, Kentucky, highly educated and apparently successful in business until about 1928 or 1929 when he began to fail in health and through a combination of circumstances became mentally depressed and somewhat dissipated. In the early part of 1929 the plaintiff became so mentally unstable that he quit work and went to various hospitals and sanitariums to try and regain his health. During much of this time he drank intoxicants to excess and it is evident that much of his distress of mind and physical disability was due to this excessive drinking. He was, of course, mentally unsound or suffering from a mental disease as is attested by the record made by the physicians who were called as witnesses for the plaintiff.

The defendant company recognized the disability within the meaning of the terms of the policies and made certain payments beginning as early as May 16, 1929.

Policy No. 465599 provided disability benefits of $50 per month in the event of total, permanent disability.

Policy No. 551756 under similar conditions provided for a payment of $75 per month.

Policy No. 5502713, the non-can policy, provided for a payment of $300 per month in the event of total permanent disability.

All three of the policies provided for waiver of the payment of premiums by the insured in the event of total permanent disability.

No claim for disability benefits was ever filed or made on policy No. 465599.

In October of 1932, the insured asked for the full cash surrender value of this policy and the company under date of October 21, 1932, complied with the request. The policy had a reserve of $935 and accumulated dividends amounting to $50.70, making a total policy value of $985.70. After deducting a loan of $935 and interest amounting to $4.68 the cash surrender value was $46.02, for which the company executed its check to the plaintiff.

The other life policy, No. 551756, had the following history. It was issued upon application of the plaintiff on August 21, 1924. The premiums were paid either in cash or by way of loans made to the insured until 1933. On November 13, 1928, the insured received a policy loan of $107.57. On January 20, 1929, the maximum loan of $283 was made. That advance was used to pay the previous loan, certain premium loan notes which had previously been given for premiums and to pay the annual premium due under the policy, February 21, 1930. In November, 1931, the loan was increased, at the request of the plaintiff, to $320, which was used to pay all prior charges against the policy and the balance was paid to the insured.

In March, 1933, the insured requested payment of the cash surrender value and there was executed to him by the company its check for $110.48 in compliance with his request. The amount of the check was arrived at as follows: On March 29, 1933, the day the check was issued the policy had a reserve of $442.35, including the reserve on dividend additions to the policy. From that was taken the previous loan of $320 and interest of $11.87, or a total of $331.87, leaving a balance paid to the insured of $110.48. Both of these life policies were surrendered to the company.

As distinguished from these payments which were strictly within the provisions of the policy without regard to any disability,

it should be noted that the company received proof of loss or a claim for disability benefits and paid to the insured on policy No. 551756 the sum of $450 on November 12, 1930.

Claims were made on the non-can policy and payments were made to the insured amounting to $2,820.

In August, 1933, the plaintiff became intoxicated and accompanied by his six-year-old son drove from Ashland to the town of Olive Hill, a distance of approximately forty miles. His father and brother pursued him, had him arrested and returned to Ashland where he was placed in jail.

On August 8, 1933, proceedings in accordance with Kentucky Statutes Sections 216aa-68, et seq., were had in the Boyd Circuit Court and a judgment was entered declaring the plaintiff here to be insane. A committee, Clyde R. Levi, was duly appointed.

Levi proceeded to make claim on the insurance company on the non-can policy and was paid the sum of $4,500 on September 7, 1933, which covered a period of disability to August 8, 1933. There was also paid to Levi the further sums of $300 and $180, which were benefit payments under the terms of the policy to September 26, 1933. No further payments were made on the policy until May 18, 1936.

To add to this already somewhat complicated set of facts the further facts appear from the record. During this period from 1929 until 1936 the plaintiff was having domestic troubles. His wife and three small children had left him and his wife had filed suit for divorce, alimony and custody of the children. His home was sold. He had an indebtedness of something over $26,000 and his creditors were pressing him. In addition to these personal difficulties he was confronted with a loss of his insurance. The Insurance Commissioner of the State of California on July 22, 1936, instituted court proceedings to have a conservator appointed for the Pacific Mutual Life Insurance Company of California (Old Company). His petition, among other things alleged:

"That said examination and report shows that respondent corporation is in such condition that its further transaction of business will be hazardous to its policy holders, its creditors and to the public; that said examination and report further shows that respondent corporation is insolvent within the meaning of article 13, chapter 1,

part 2, division 1, of the Insurance Code of the State of California [St.1935, p. 537]; that respondent corporation's said hazardous and insolvent condition is principally caused, among other things, by reason of the fact that respondent corporation has for a considerable number of years last past issued a large number of non-cancellable accident and health policies at a premium rate which was and is now entirely inadequate to maintain the reserves required by law to mature said policy obligations."

On February 3, 1936, Levi resigned as committee and Richard B. Hager, plaintiff's brother, was appointed to succeed him. An effort was made to arrange to satisfy certain creditors among whom was plaintiff's divorced wife who had secured a judgment for $5,000. With this in view the committee, endeavoring to prevent an attachment on proceeds from the policy in the hands of the company and also evidently realizing that the financial condition of the insurance company at that time did not appear to be the best, effected a settlement on all claims under the policy for $16,500. In my judgment the settlement of this claim in view of all the circumstances was an excellent piece of business for the insured.

It should further be pointed out that throughout the time from the appointment of Levi as committee sums had been advanced either directly to the insured or indirectly for his care and benefit.

Appropriate proceedings were had and the plaintiff was restored to sanity on December 5, 1936. The record discloses that the final order was not entered until December 11, 1936.

The committee, Richard B. Hager, made his settlement and in the presence of A. W. Mann, his personal friend and attorney, the settlement was approved by John F. Hager, Jr. It is proper to state that A. W. Mann is known to this Court to be a capable and ethical practitioner.

The defendant's brief, borne out by the record, gives the analysis of the receipts and expenditures of Richard B. Hager, committee, as follows:

| | Receipts | Expenditures |
|---|---|---|
| Pacific Mutual paid to Levi.... | $ 4,980.00 | |
| Pacific Mutual paid Richard... | 16,500.00 | |
| Interest earned on notes........ | 22.50 | |
| Paid to Pacific Mutual for two premiums on Non-can policy | | $ 165.00 |
| Jack spent between Dec. 4, 1936 and Apr. 19, 1937........ | | 982.21 |
| Doled out to Jack by Committees ........................... | | 875.60 |
| Turned over to Jack at end of Mann's Committeeship ....... | | 3,706.79 |
| Administration expenses and court costs ..................... | | 2,456.86 |
| Jack's personal lawyers........ | | 550.00 |
| Various small creditors....... | | 3,261.20 |
| Receiver of Ashland National Bank ......................... | | 637.16 |
| Margaret M. Hager, Jack's Mother ...................... | | 1,195.50 |
| Henrietta Hager ............... | | 5,272.20 |
| John F. Hager, Sr., and his estate ......................... | | 2,399.95 |
| Total ...................... | $21,502.50 | $21,502.50 |

The defendant's brief also contains the following table showing the amount of benefits on the three policies received by the plaintiff. This is, of course, aside from the sums acquired by him as loans and cash surrender values.

| Amount of Payment | Date of Payment | Period Covered by Payment | Policy Under which Payment was made |
|---|---|---|---|
| $165 | May 16, 1929 | Feb. 8, 1929–Apr. 15, 1929 (25% of hospital indemnity for 2 mos. 6 days) | Non-can |
| $1725 | Nov. 11, 1930 | Feb. 3, 1930–Oct. 1, 1930 | Non-can |
| $450 | Nov. 12, 1930 | Feb. 3, 1930–Nov. 3, 1930 (eliminating first 90 days) | 551756 |
| $550 | Feb. 27, 1931 | Oct. 1, 1930–Jan. 1, 1931 | Non-can |
| $380 | May 21, 1931 | Jan. 1, 1931–May 21, 1931 | Non-can |
| $4500 | Sept. 7, 1933 | Entire period up to August 8, 1933 | Non-can |
| $300 | Sept. 8, 1933 | Aug. 8 to Sept. 8, 1933 | Non-can |
| $180 | Nov. 1, 1933 | Sept. 8 to Sept. 26, 1933 | Non-can |
| $16500 | May 18, 1936 | Complete and final settlement, cancellation and surrender of all three policies | |
| $24750 | | | |

The plaintiff contends that the settlement on the first two policies should be set aside because at the time of settlement the plaintiff was incompetent. He contends that the settlement made by his committee, Richard B. Hager, is invalid because Richard B. Hager was not his lawful committee. That the proceedings in the Boyd Circuit Court which resulted in his being declared insane were not in accordance with the Kentucky Statutes and void and therefore since the judgment of the Boyd Circuit Court was void the acts of Richard B. Hager as committee were without authority and invalid.

█ I am of the opinion that the settlement on the two life policies is binding on the plaintiff. At that time he was legally sane and could transact his own business. I went into minute detail in the statement of facts because I felt it important to show that the transaction in connection with these policies of insurance had covered a number of years and the plaintiff had on several occasions secured money from the company.

This record is not convincing that John F. Hager, Jr., was a hopeless incompetent. On the contrary he shows considerable aptitude in handling his affairs. He realized $24,750 on these policies. He testifies clearly and impresses me with the idea that most of his incapacity was due to dissipation which he says was only at intervals. There was a period from 1933 until 1938 when he had many lucid intervals for months at a time that he did not take any steps to repudiate these settlements. He had the advice of counsel throughout this time. He was constantly in contact with his friends and representatives in the handling of his property yet no attempt was made to undo his action in regard to these two policies.

He had borrowed the full amount afforded by the policies. The country was in the depth of the depression. It may be that he wanted to liquidate his indebtedness which might be for various reasons. Certainly the record does not disclose sufficient proof to justify the Court in nullifying a perfectly reasonable settlement of five years standing.

His committees were in constant communication with the insurance company. I am convinced that all of them and his personal friend and attorney, A. W. Mann, were endeavoring to get everything that was due him from the company on his policies. The record discloses from both the testimony of the plaintiff and Mann that he was frequently in Mann's office during this period of time.

All of these factors coupled with the responsibility of sustaining the burden of proof, which is placed upon the plaintiff, lead me to the conclusion that the settlement of the two life policies must be sustained.

█ The burden of proof is upon the plaintiff to show that he was without capacity to enter into these settlements. This burden of proof is not sustained. The evidence is not convincing. A transaction with a person not adjudged insane will not be annulled unless insanity is so obvious that ordinarily prudent persons would take notice thereof; and where ordinarily prudent people would differ on the question whether a person is insane, and a transaction with him is in good faith, without undue advantage or fraud, the transaction will not be disturbed. Cummins' Adm'r v. Walker's Committee, 252 Ky. 5, 66 S.W. 2d 48.

In the earlier case of Bevins et al. v. Lowe et al., 159 Ky. 439, 167 S.W. 422, 423, the Kentucky Court of Appeals said: " * * * the burden of proof is upon him who asserts the lack of such capacity * * *. To overcome this presumption, as indeed any presumption of law, there must be more than a mere equilibrium of testimony.

"And the evidence must clearly establish the charge of such incapacity. In Logan v. Vanarsdall, 110 S.W. 321, 33 Ky.Law Rep. 508, the court held that where a transaction is old, and has been permitted to stand for a long time without complaint, the presumption in its favor is strong, and it will not be set aside except upon clear evidence."

With reference to the non-can policy it is my judgment that the plaintiff was never legally declared insane and that the orders appointing Levi and later Richard B. Hager, committees respectively, are void.

The proceeding for the adjudication was had under Ky.St. Section 216aa-68, et seq.

█ I do not believe that under our Federal and State Constitutions a person can be declared incompetent and have his property taken out of his hand or be placed in confinement without the intervention of a jury and the verdict of a jury declaring

him to be non sui juris. It seems to me that the statute is repugnant to our whole constitutional system.

■■ The very fact that a person is insane or charged with being insane is equally as great if not even a greater reason to make the trial public and before a lawfully constituted jury than in the case of a person charged with crime. Nor should there be permitted a waiver of jury. Possibly without reason or capacity to properly select counsel or to defend himself a provision to permit a waiver of rights seems improper and on the same plane with the provision in Section 216aa-74 that he may demand a jury, which in my judgment is void.

The Bill of Rights of the Constitution of Kentucky provides that "Absolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic" Section 2 and "all men * * * have certain inherent and inalienable rights, among which may be reckoned * * * the right of enjoying and defending their lives and liberties * * * [and] the right of acquiring and protecting property." Section 1. The Bill of Rights also provides that "the ancient mode of trial by jury shall be held sacred, and the right thereof remain inviolate, subject to such modifications as may be authorized by this Constitution." Section 7.

The Constitution of the United States provides that no person shall be deprived of life, liberty or property without due process of law.

While apparently the Kentucky Court of Appeals has not passed directly upon this question in Daly et al. v. Spencer's Committee et al., 260 Ky. 19, 83 S.W.2d 502, 505, the opinion states: "Plainly, this evidence is not sufficient to sustain the order appointing a committee, and the fact remains that that order is void. A void judgment is no judgment and may be attacked at any time. Ramsey's Ex'r v. Ramsey, 233 Ky. 507, 26 S.W.2d 37. We do not find it necessary to determine whether or not the inquest itself is void, although it may be seriously doubted whether a jury could be waived in such a proceeding. Howard v. Howard, 87 Ky. 616, 9 S.W. 411, 10 Ky. Law Rep. 478, 1 L.R.A. 610; Sabin v. Commonwealth, 233 Ky. 636, 26 S.W.2d 506. As we pointed out above, section 2151 of the Statutes requires the inquest of a jury as a condition precedent to the appointment of a committee."

■ There has been no repeal of Section 2151, Kentucky Statutes, and the requirements that a jury be empaneled are mandatory. Downing v. Siddens et al., 247 Ky. 311, 57 S.W.2d 1; McFarland v. Commonwealth, 249 Ky. 128, 60 S.W.2d 360; Revlett v. Revlett et al., 274 Ky. 176, 118 S.W.2d 150.

■ A full discussion of this question is had in the case of James E. Ferguson v. Dr. F. G. LaRue in XXII Kentucky Law Journal page 99, (November 1933). In this opinion, written by Judge Richard C. Stoll, former Circuit Judge of Fayette County, it is well stated as follows:

"A person against whom an information of lunacy has been filed, is entitled to notice, and he is entitled to be tried by a jury of his peers. If he is confined to the asylum his liberty is taken away from him. If he has property a committee is appointed who takes away from him the right to manage his property, and he is therefore deprived of his property and the use of it. Under our constitution such a procedure cannot be had.

"The petition for an inquest, however, was properly filed in the Lawrence Circuit Court. The affidavits made by the physicians that he is of unsound mind, must and could not be brought into court, are regular upon their face, and so the Lawrence Circuit Court had jurisdiction to determine the sanity of Ferguson, but in order to do so it acted beyond its jurisdiction when it undertook to try him without notice to him personally and without giving him the right of trial by jury.

"I am therefore of the opinion that notice of an inquest must be actually served upon a person charged to be a lunatic; that no person for the alleged lunatic has a right to waive a trial by jury; that the alleged lunatic is entitled to a trial by jury."

■ I am therefore of the opinion that the appointment of Richard B. Hager was void, and that he had no authority to make the settlement on the non-can policy.

However, I am equally convinced from all the evidence in this case, having seen and heard the witnesses in open court, that the plaintiff knew exactly what he was doing for the greater part of the time from 1929 until the day of trial. That he was never at any time, except possibly at short intervals from intoxication, without mind to know the value of his property and the interest he had and its value in these in-

surance policies. I am convinced that his approval of the settlement made by his brother was made with full understanding of its import and further than that with an appreciation of securing a relatively substantial sum of money from a corporation whose financial future was not, to say the least, secure and above question. He ratified all the acts of his agents in these settlements, accepted their benefits and after two years seeks to repudiate what at the time was a most beneficial business transaction to him.

The plaintiff is above the average in intelligence and with the exception of possibly short intervals during periods of dissipation knew at all times what he was doing. To cancel this settlement would be essentially unjust. Plaintiff had endorsed the report of Richard B. Hager. "Examined and Approved" and signed his name. He had at that time been restored and was attending to his own affairs. He was completely at himself. There is no claim to the contrary.

■ There was given to him at the time a large sum of money which he accepted. This money was from the settlement on the non-can policy. He accepted it and approved the accounting of his brother Richard in the presence and with the approval of his personally selected and employed attorney. This was certainly a ratification of the settlement had with the insurance company by his agent and brother.

■ It is recognized, of course, that there can be no ratification of an act which is void. The record here does not present such a case. The period of time covered in making the settlement on the non-can policy was from February 3, 1936, until May 16, 1936. The record here convinces me that during the greater part, if not all, of this time the plaintiff was actually sane even though the records of the State court showed him to have been adjudged "legally" insane. He was in constant communication with his brother and with his attorney, A. W. Mann, and advised with them on the state and condition of his property and affairs generally.

Mr. Mann, plaintiff's personal attorney, and later his committee, testified (T. 63–64)

"Q. 9. Were you familiar with that settlement which was made or about it? Did you know about it? A. I had no personal knowledge of it, just by hearsay. I talked to Jack and probably I talked to Dick later about it.

"Q. 10. Did you talk to him before or after the settlement or about the time of the settlement? A. Oh, practically all along during that time.

"Q. 11. Do you know how you happened to know about it? Did you tell Jack about it, or did he tell you? A. I think Jack told me. Jack came to my office quite frequently to discuss matters during those times.

"Q. 12. Was it your understanding that the settlement involved the cancellation of the policy? A. That was my understanding, although I had no connection with the settlement and no personal knowledge of it at all.

"Q. 13. Are you able to say that you got that understanding from Jack? That knowledge of the settlement? A. I think likely I got it from Jack, yes. I say that because in those days I was not brought into much contact with Mr. Richard Hager.

"Q. 14. Beginning in the Fall of 1933, or along about September, 1933, after Jack Hager came back from Lexington, and the Veterans Hospital, did he then talk to you about his affairs and discuss his affairs with you? You remember that? A. Jack began to come to my office back in along about that time, I would imagine and to discuss these matters with me and he became eventually a very frequent visitor at my office."

Further, it must be borne in mind that during all of this time his creditors were trying to collect their various claims and the possibility of the insurance money was the best prospect. The undertaking of Richard B. Hager was to secure for the wife and children the full amount of their judgment, the thing which the plaintiff says he wanted most, appease other creditors without getting the whole fund tied up in the hands of the insurance company by some creditor and all of which must be done before the insurance company went into actual bankruptcy, which was always a possibility.

■ A person legally insane may be actually sane and if that be true may act through an agent as any other person or may ratify the acts of his agent as any normal person. The record here leads me to believe that John F. Hager, Jr., was deliberately remaining "legally" insane until his financial difficulties could be adjusted. His "legal" insanity was something of a

stumbling block to creditors in their efforts to press their claims.

Since the proceeding adjudging him insane was void and the Court finds from the record here that he was in reality sane during all of the time of the negotiations over the non-can policy, we have then a person legally and actually sane transacting business through an agent, Richard B. Hager, who negotiated a settlement most beneficial to him, ratified and approved in writing shortly after the settlement, which was made with his full knowledge and consent, and further ratified by accepting its benefits and making no complaint for a period of two years.

In 1 Mechem on Agency, § 371, the author says: "one on whose behalf an act has been done during his insanity may, after his sanity is restored ratify the act."

See, also, Jones et al. v. Evans et al., **7** Dana 96, 37 Ky. 96.

In view of all the record I am of the opinion the plaintiff's complaint should be dismissed.

Findings of fact, conclusions of law and judgment in accordance with this opinion should be submitted.