## Collins et al. v. Isaacs.

(Decided November 1, 1929.)

**378**

HAWK & LEWIS for appellants.

R. MONROE FIELDS for appellee.

Opinion of the Court by Chief Justice Thomas— Affirming.

Jasper Collins, who was nicknamed "Babe" Collins, died intestate and a resident of Letcher county on November 25, 1924, at about 65 years of age. Nearly 4 years prior to his death, and in the fall of 1920 he suffered a stroke of paralysis, which confined him to his bed for 5 or 6 weeks, after which he recovered, but with considerable impairment of his powers of speech. Some time after that, but not exceeding 12 months, he sustained another stroke, followed by similar results, and he again recovered, after about the same length of time; but the two strokes produced what his physician described as "motor aphasia," which, as explained by the witness, means "the loss of speech, the result of pressure upon the nerve supplying the muscles of the tongue." The witness described his first stroke as "mild," and the combined result of both strokes does not seem to have impaired his power of locomotion, since he had good use of his legs and arms, and after recovering from the immediate effects of both strokes he went about as usual, and much of the time alone. The aphasia destroyed his power of speech, except the use of four or five words, among which were "yes" and "no." However, it was

shown by those with whom he was well acquainted, and with whom he associated, that he adopted a system of signs, by which he could usually and with some effort make himself fairly understood, although the members of his family, and especially appellants, who were the defendants below, testified to alleged conversations with him that would be difficult indeed to be communicated by any system of signs. He had but a limited education, but his power to form words with letters, or to write, seems also to have been lost as a result of the two strokes, and which is explained by Dr. Wright, the only physician who testified in the case, as not infrequent with such patients.

Collins owned 1,600 acres of land in Letcher county in one body, upon a portion of which was located his residence, and near his residence he had for a long time operated a country store on Rock House creek. For a short while immediately preceding the first stroke, his health somewhat failed, and after that he sold his store to his son, John Collins. Some time prior to October, 1918, the first wife of Jasper Collins died, leaving as her surviving children six of the appellants, who are adults; the other appellants being children of a deceased daughter, some of whom are infants. In October, 1918, Collins married the appellee and plaintiff below, who was the widow of one Amburgy, and she had three children by her first husband.

After that marriage, Collins and his wife, with the Amburgy children, resided in his residence above referred to, until after the first stroke of paralysis, or possibly after the second one, when they moved to Whitesburg, in which city the husband bought a house and lot, for which he paid $4,500, taking the deed to himself. In 1919, and before the first stroke of paralysis occurred, Collins, influenced, no doubt, through apprehension as to his health, divided 1,300 acres of his land among his six adult children by his first wife, he having theretofore made provision for his deceased daughter, who married W. W. Sergent, and who was and is the father of the other appellants and defendants below.

Along about the 1st of January, 1922, Collins executed a deed to the house and lot in Whitesburg to the appellee and plaintiff below, his then wife, and now his surviving widow, but who has since married a man by the name of Isaacs, and this equity action was filed by

her in the Letcher circuit court on April 1, 1925, against the adult children of Collins by his first wife, and the grandchildren of the one that was dead, seeking to quiet her title to the house and lot so conveyed to her by her husband, and in her petition she alleged the conveyance to her, the recording of her deed in the county court clerk's office, as well as the indexing thereof, and that defendants in the petition were casting a cloud upon her title by claiming to own the property themselves. She further alleged that defendants, one of whom was a grandson of Collins and the county court clerk of Letcher county (Archie V. Sergent), had destroyed the record of her deed, the index thereto, and also the deed itself, and she prayed that she be adjudged the owner and entitled to the possession of the involved property, and, since some of the defendants were infants, she also prayed that the master commissioner be directed to make her another deed to the property.

In the orginal answer, defendants denied that any such deed had ever been executed by Jasper Collins, or that any such deed had ever been recorded in the county clerk's office of Letcher county, and, of course, it was denied that any of the defendants had destroyed such deed, or the record thereof. In another paragraph they averred that, at the time Jasper Collins executed the deed, if he did so, he was of unsound mind and unduly influenced to do so, and that it was void for those reasons, and they asked that the title to the involved property be adjudged to them as the heirs of Jasper Collins.

As a result of the latter's second marriage, two girl children were born, Opal and Mildred Collins, the last of which was begotten and born after the father's paralytic strokes as above set out, and shortly following the birth of Mildred he executed a deed for the remaining 300 acres of his original 1,600-acre tract to his two infant children by his second wife, with certain life reservations to himself and plaintiff as his then wife, or to the survivor. Defendants later amended their answer, in which they admitted that Collins had executed such a deed as claimed by plaintiff, but reiterated the alleged grounds authorizing its cancellation. Proper pleadings made the issues, and, after extensive proof taken, and upon submission, the learned special judge who heard the case sustained the prayer of plaintiff's petition, and adjudged her to be the owner of the house and lot in contest, and

quieted her title, and dismissed all counter relief sought by defendants, and to reverse that judgment they prosecute this appeal.

On behalf of plaintiff it is shown by a great number of witnesses, including the only physician who testified in the cause, that Jasper Collins, after recovering from the immediate effects of his two strokes, was mentally capacitated to transact business, and was capable of comprehending and understanding the subject-matter of a contract, its nature and probable consequences, and which is the measure of mental capacity sufficient to sustain an executed contract, as applied by this and other courts and by all text-writers on the subject. See 9 Corpus Juris, 1177, sec. 38; Black on Rescission and Cancellation (2d Ed.) vol. 2, p. 741, sec. 263; 4 R. C. L. 503, sec. 17; 22 Cyc. 1170; Wathens v. Skaggs, 161 Ky. 600, 171 S. W. 193; Williams v. Reese, 177 Ky. 679, 198 S. W. 27; Gillock v. Williams, 199 Ky. 169, 250 S. W. 836, and other cases cited in those opinions, including still others following them. From those authorities it will be found that "the true test always is the person's capacity to understand and assent to the particular transaction in question. However much his mental faculties may be impaired, or however low his natural endowment of intelligence, if he possesses the mental capacity to understand in a reasonable manner the nature and consequences of the transaction before him, and to exercise a reasonable measure of judgment and choice in regard to it, he is sane, quoad hoc, and must be held bound by what he has done." Excerpt from Black on Rescission and Cancellation, supra, on page 743. In the note to that text are cases from many of the courts of the Union, and it is in accord with that employed by other law writers, and applied by this court in the cases supra.

Of course, it is equally as well established that a low degree of mental capacity *accompanied with fraud and undue influence* will authorize a cancellation when, in the absence of such fraud and undue influence, none would be adjudged. It will also be found, from a reading of the above citations and many others which could be included, that the nature of the transaction, its fairness and justice, coupled with a pre-expressed desire to perform the attacked act, when made at a time not far removed, and when the alleged incompetent was in perfect mental condition, are facts of considerable weight in determining

the issue here involved; i. e., the mental capacity or incapacity of the alleged incompetent at the time he made the attacked contract. With these generally stated principles of law before us, we will briefly survey the testimony introduced on the trial.

We have referred to the general tenor of the testimony of plaintiff and her witnesses, but in addition to it two upstanding witnesses, who were residents of Letcher county and intimately friendly with Jasper Collins, testified that the latter held separate private conversations with them before he sustained his first paralytic stroke, and after he had divided 1,300 acres of his land as above set out among his six surviving children by his first wife (the deed to each of whom plaintiff willingly executed), and in those conversations he confided to those two lifelong friends his intention and purpose to make an equitable provision to all of his children, and to divide his property in the way and manner he wanted it to go before his death, and which included the later conveyance of his remaining 300 acres to his two infant children by his last wife, he at that time not having acquired the house and lot in Whitesburg, and, if the deed to it can be successfully attacked in this case, then, of course, the deed to the two infant children, whereby they were vested with title in remainder to the 300 acres, would be vulnerable to the same assault, since it was made after the making of the deed involved in this litigation.

It is true that it was shown in this case that Mrs. Collins at one time, when her husband was undergoing the immediate effects of one of the strokes, being worried because of his condition, both mentally and physically, during such period went to Whitesburg to consult with the county judge or a lawyer as to what, if anything, could be done, and she was advised to inaugurate inquest proceedings, with the view of having a committee appointed for him; but all of the appellants opposed that proceeding, and did not suffer an inquest to be made, and none was ever held. At most, that act on the part of appellant would be competent to contradict her present contention that her husband was mentally capacitated to make the deed in contest. However, it occurred long before the deed was made, and it should be remembered that the law permits a committee to be appointed for physical incompetency, as well as for mental incompetency. At any rate, the testimony shows beyond contra-

diction that, following such application by plaintiff, and extending to and within a short time before his death, Collins was competent to execute the deed in contest, as measured by the rule, supra.

Much ado is made by defendants over the alleged fact that plaintiff left her husband on perhaps a couple of occasions following the first stroke of paralysis; but she denies that any of the temporary absences of herself from her home were intended as a separation, but only to obtain a few days' needed rest from multiplied labors, and there is nothing in the evidence successfully contradicting her statement on that subject. Plaintiff also proved, not only the execution of the deed, but that it was delivered to Archie V. Sergent, who took the acknowledgment of the grantor to it, for recordation in his office of county court clerk, and that his deputy did on the next day record it, and made the proper index thereof. It was furthermore proven that within less than a year thereafter the index was erased, and another index of a deed between different parties was written over the erasure, and the loose leaves in the book where the contested deed was recorded had been taken out, and the same pages on different paper inserted, and upon which appeared the record of a totally different deed. Those facts were testified to by a Miss Bently, who was a deputy clerk under Archie V. Sergent, and they were corroborated by the wife of one of the attorneys for appellants, who made investigations of the record, both before and after the alteration took place. After being confronted with that testimony, appellants surrendered their original contention that no such deed had ever been made. But Archie Sergent, the county clerk and grandson of Jasper Collins, is serenely ignorant as to how his records were so mutilated and substituted. He does say, however, that after the deed was executed it was left in his office, and later taken by his grandfather and put into a bank, and again brought back to his office with other papers of the grantor, all of which were put into a safe in his office, and that his grandfather afterwards came and got the deed and tore it up.

That fact is heralded in this case as a most potent one to sustain the charge that Jasper Collins was mentally incapable of executing the deed, which, if true, rendered him also mentally incapacitated to legally destroy it. But it has not escaped us that it is a curious fact that

no one was in the county court clerk's office on the occasion of his destruction of the deed, except the grandson (defendant, Archie V. Sergent), who permitted the original answer in this case to be filed in which it was averred that no deed at all had ever been executed by Jasper Collins to appellee, his widow, when he himself had taken the acknowledgment to that deed. So that we are not altogether prepared to accept as a fact the statement that Jasper Collins destroyed that deed in the manner detailed by Archie Sergent, or, in, any other manner. If defendants conscientiously and bona fide believed that Jasper Collins was mentally incapacitated to execute the involved deed (as they now claim), then the destruction of the record was useless; but, if it were otherwise, and he *was* mentally capacitated to execute it, then the destruction of both the record and the deed might be of service to those who desired its riddance.

The immediate facts surrounding the execution of the deed were these: In the early part of the night in which it was executed, Collins had a slight attack, described by the witnesses as a "fainting" spell, and which the doctor explains as being due to a weakness of his heart, and during which he appeared to be, and was, no doubt, unconscious. He rallied from that, but in the meantime the members of the family sent for Archie Sergent, who lived nearer the home than any of the appellants, some of whom resided quite a distance in the county. After Collins recovered from his smothering spell, he went into an adjoining room and returned with the deed that he had previously procured a local attorney (but who is now deceased) to write. He indicated in an understanding manner his desire to execute that deed, and, not being able to write, he made his mark, which was witnessed by the three Amburgy children and acknowledged it before his grandson, the appellant Archie V. Sergent. After it was executed, Collins submitted it to another attorney, who also has since died, and who advised him of its full effect, and he then took it and departed.

Defendants testified that, according to their opinion, Jasper Collins had practically no mind after he sustained his first stroke, although they attempt to give detailed and intricate conversations with him, and which, we repeat, were impossible of communication by sign language only. Some of the stories told by some of those

witnesses are so unbelievable as to be ludicrous, but a curious fact attends practically every one of the occurrences to which they testify, and which is, that they always happened when no one was present, except the witness and the deceased, Jasper Collins. It would serve no useful purpose to detail any of the incidents of the character indicated, and to which they testified, since under the testimony as a whole the learned chancellor, who heard the case and rendered the judgment appealed from, found that Collins possessed the requisite legal mental capacity to execute the involved deed, and, under the rule prevailing in this court as to the weight that should be given the judgment of the chancellor, we are clearly unauthorized to disturb his finding on that issue.

It is insisted, however, that the testimony in this case brings it within the rule announced in the cases of McElwain v. Russell, 12 S. W. 777, 11 Ky. Law Rep. 649; McDowell v. Edwards, 156 Ky. 475, 161 S. W. 534, and Miller v. Ferrell, 197 Ky. 643, 247 S. W. 967, since it is contended that the facts of those cases are substantially the same as those in this one. We have not only read the opinions of those cases, but have also read the opinion in every cited case in each of them, and, without stopping to point out the difference in the facts, we deem it sufficient to say that they are about as far apart as the north and south poles. In each of them the testimony disclosed reeking fraud and a most selfish design on the part of the vendees in the conveyances sought to be cancelled, to none of whom was the grantor under any sort of moral obligation, nor did they hold any claim on the grantor for the bestowal of his bounties. In each of them the grantor was much more clearly shown to be incapacitated than is true in the instant case. Indeed, the rule is that, before a cancellation will be adjudged of an executed contract, plaintiff must make out a ''clear case with strong and convincing evidence.'' 9 C. J. 1254, sec. 196; Bevins v. Lowe, 159 Ky. 439, 167 S. W. 422. That rule as to the quantum of evidence necessary to authorize the cancellation of an executed contract is universally recognized and approved, and was distinctly so done in the Bevins case, supra.

Wherefore, being convinced that the judgment was correct, it is affirmed.