# Everett v. Downing.

June 20, 1944.

196

R. Ruthenburg and J. P. Karem for appellant.

Louis Seelbach and Bullitt & Middleton for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

Appellant, plaintiff below, appeals from a judgment entered under the court's instruction to the jury to find for defendant, in her action seeking to recover a judgment for $17,000. The facts appear to be that in December 1927 appellant suffered serious injuries in a railroad wreck in the State of Indiana. She was taken to

a Jeffersonville hospital, and shortly thereafter removed to a Louisville hospital. The following April she was taken to a hospital in Hot Springs, Arkansas, where she remained under treatment until the fall of 1928. Upon her return to Louisville she took up her abode at the Kentucky Hotel, and was visited by a representative of the railroad company who proposed a settlement by payment of $10,000.

Following the offer appellant called an attorney with whom she discussed her injuries. She informed him of the proposal and they agreed that she was entitled to a larger sum. The attorney, who testified for her, believed that she was not then competent to contract, and decided he would think over the matter, which included the idea of appointment of a committee. He returned the following morning when appellant informed him that she had entered into contract with appellee.

As to what immediately followed there is some discrepancy, though not of material importance. Appellant says that a friend, Mr. Hurley and his wife, came and wanted her to have a conference with appellee, looking to a handling of her claim. She makes it appear that Mr. Hurley and appellee came to her room and rather forced her to sign a written contract of employment. She told of her condition at the time and said that she was under such disability, and incapable of making a contract, about which she remembered very little until later, then through correspondence. and some conferences with her physicians at Hot Springs, to which place she later returned. This contract was in writing, and appellee's version of its consummation was to the effect that he went to appellant's room at the hotel, where her injury and its results were discussed, as he says, by appellant in a rational manner. The contract is in exhibit; as originally prepared, it provided for a fee of an amount equal to twenty-five per cent of recovery by suit, trial or compromise. Appellant objected to a percentage of the total, since she had been offered a settlement as above stated. The contract was then interlined so as to limit the per cent to any sum above the first $5,000, in the event the recovery should not exceed $25,000. Appellant in testimony did not recall any discussion leading up to the interlineation.

Following the signing of the contract appellee pre-

pared and filed suit seeking $65,000 damages. Thereafter appellant, upon advice of friends and appellee, returned to Hot Springs, where as the proof shows she was under the care of nurses and physicians, and where appellee saw her on several occasions, and talked with her physicians, looking mainly as we read the record, to the preparation of the pending suit by taking depositions. During these visits, and later, appellant says she was suffering very much; in a highly nervous condition, unable to write or compose letters or to understand the import of what she read or what was read to her; that most of her correspondence was in typewriting, neither composed nor written by her. It was while in this disabled condition, she insists, that appellee had her sign a paper authorizing a settlement of her claim, which she says she did not understand. This was signed by Miss Everett on May 28, 1929, and authorized settlement at a sum not less than $20,000.

Typical of letters filed as exhibits is one of May 31, 1929. This is typed but signed by appellant, and shows understanding. It reads in part: "In signing the proposition for the very minimum amount which I will accept for this injury I expect to be added to it every cost that is incurred in the collection. I tried to make that plain, and I mean the cost of all doctors, depositions, etc., are to be paid by the railroad company." She added that she had been informed that such was the practice in settlement of such claims. "I presume that you understand this, but I cannot recall that it was made plain to me." This was followed by a letter from appellee advising appellant that while he could not collect all the expenses indicated, he would pay certain itemized expenses, which must have been satisfactory as we find no response.

In a letter of June 5th appellee advised that he had succeeded in settling for $20,000, which, after deducting his fee, would be paid to her. This met with a letter written by appellant, showing some displeasure at the amount of settlement, but in which she said, "Do not feel that I am displeased with you; I believe you did all that could have been done.."

On June 29, 1929, a check was sent to the Arkansas Trust Company for $20,000 with instructions to secure a release; have Miss Everett endorse the check and place the proceeds to her credit after sending appellee a

check for $3750. This was accomplished by a bank employee, who went to the hospital. He had appellant sign what is styled "mutual release and receipt between Lillian B. Everett and W. W. Downing." It was signed and witnessed, and acknowledged receipt of the net sum, showing also that appellee had paid certain expenses as agreed in a former letter.

There is slight but immaterial disagreement as to what led up to the stock purchase. Appellant said that on one of appellee's visits to Hot Springs, he said: "When you get your money some one will have to invest it for you," and appellant replied, "Some one will have to." Appellee said that she made the suggestion, and that some one would have to advise her. On July 15, 1929, appellee wrote Miss Everett saying that his purpose was to discuss the advisability of "investment at this time." He wrote two and one-half pages, single space, and suggested that he considered Diversified Shares Series B a safe investment, having a ready market at the time, giving minute particulars as to the make up of these and other securities. He suggested that if she preferred she might obtain 6% Louisville Title Company first mortgage bonds, but on which there was a small tax; also Government certificates. He wrote that for speculative purposes Air Reduction, in which some members of his family had invested, had good prospects, and likewise as a speculative investment Reynolds Investment Company stock. Summarizing, he thought that a good investment would be 50 shares of Air Reduction, 100 shares Reynolds, and the remainder of her funds to be invested in Diversified Shares.

Appellee testified that shortly after the letter of recommendation appellant called him by phone and said she wanted to buy Air Reduction and Reynolds. Just when this was is not shown, but appellee by telegram of date July 13, notified appellant that he had not purchased any stock because of rapid rise in Reynolds and Air Reduction. He advised that brokers would call at the Monday opening, and he would put in order for Air Reduction at $165 and Reynolds at $44.-50, "unless advised to the contrary." On the following day appellant telegraphed: "You know the circumstances and affairs. For the present you will just have to use your own judgment about buying and that will be all right with me. I have been ill and have not

gone into your letters." Appellant says that the telegram was written and composed by one of the hospital nurses.

Appellee had at one time suggested in the phone message that appellant go to a broker's office in Hot Springs and buy the stocks. On receipt of the telegram appellee ordered, through Hillard and Sons, 100 Shares of Reynolds at $44.50, and 50 shares Air Reduction at $165. These were placed in the name of Miss Everett, and the Air Reduction was sent her. She then wrote to appellee and asked that he get the Reynolds and place it in her safety box at the bank, which he did. Later, in September, appellee ordered by phone 140 shares of Diversified Shares from the Ferguson Company. These were also issued in appellant's name, and were paid for by her check drawn on her account at the Arkansas Bank; the records of the same bank showed payment by check of the stock bought from Hillard and Sons and the Ferguson stock.

Appellee testified that at all times in his conversations with appellant she talked in a rational manner and understandingly; that his recommendation was at her suggestion, as a matter of accommodation, without compensation, and after the relationship of attorney and client had ceased. He said that he believed at the time the investments, though speculative, were safe and being traded in by the public generally, and that on his recommendation members of his family had purchased some, and he himself had purchased one class. There was proof, undenied, corroborating the testimony that the stock at the time was considered good, and being traded in generally by citizens of Louisville.

Miss Everett held these stocks until some time in 1932. That year she made an effort to borrow from the Hot Springs bank, but was unsuccessful. It was about this time that she conferred with an attorney in Hot Springs as to what might be done to relieve her situation, since we find in the record a letter from him to counsel in Louisville suggesting co-operation looking to a movement for relief.

There are many side lights which might be mentioned in detail, but to do so would take too much time and space. These are evidenced by letters and other exhibits filed, filling several volumes of transcript along with the mass of testimony, some which relate to matters

occurring before, and some after the transactions, held incompetent by the court, but no doubt considered in an effort to solve what the trial court rightly denominated an "unfortunate situation." It appears from briefs, and without denial, that appellant, in her proper person, in 1934 filed suit against appellee. Whether to recover as in this case, or attacking the contract or settlement, does not appear; this action was dismissed without prejudice. It was pleaded, and the record shows, that appellant was adjudged incompetent in January 1935. Her committee thereafter instituted suit in the Federal Court seeking to set aside the compromise settlement, and the court held that she had failed to make a case. Appellant was adjudged to be competent later in 1941, and the instant suit was filed in December 1941. While these matters may not be relevant to the one issue in question, it is apparent they were not overlooked by the trial court, and that court was impressed, along with other evidence, and particularly the letters passing between the parties that appellant, while unquestionably suffering from her injuries and in a highly nervous condition, was competent to understand the import and meaning of the transactions.

The question presented turns on the application of law to the facts, and the solution might be decided on strictly technical grounds. It is to be noted that counsel for appellant in his pleading based the right to recover mainly on the ground that appellee occupied the position of de son tort fiduciary or trustee, and this being the status appellee was under the duty to invest the funds in the character of securities set out in section 4706 et seq., Kentucky Statutes, now KRS 386.020, and cites respectable authority to maintain the latter position, if the premise be sound. Robertson v. Robertson's Trustee, 130 Ky. 293, 113 S. W. 138, 122 Am. St. Rep. 368, and others of like import. A cursory examination of these show in every instance two facts, first, that there existed the legal fiducial relation by reason of appointment and qualification, or by operation of a legally created trust. Section 386.010, KRS, then KS sec. 4711-1, defines "fiduciary," and it is clear that appellee did not come within the definition.

Appellee, after the settlement, did not have in his hands any funds belonging to appellant for investment or otherwise. From that time on he was doing nothing

more than giving appellant gratuitous advice; whether this was at his or her solicitation is of little importance. The most that could be made of the relationship would be that of principal and agent, and the elements are not such as to create that relationship.

However, appellant argues that during the times in controversy appellee knew or should have known that appellant's mental condition was such that it was his duty to have a committee appointed to care for her affairs. Appellee was, perhaps, in as close touch with appellant during the transaction, by correspondence and personal visitations, as any others, save perhaps her physicians and nurses. He said that during all the conferences appellant talked of her affairs in a rational and understanding manner. Prior to the settlement a reputable physician had assured appellee that appellant was competent to understand the nature and effect of the transaction. In the preparation of the suit against the railroad company he had interviewed a physician who had treated appellant following her injury, and had other reputable physicians examine her, who, while finding Miss Everett to have been in a nervous condition, found no mental involvement or disability. These facts, together with appellee's personal knowledge, justified his belief that appellant was mentally competent. It is true that in the preparation of the case appellee took depositions of other physicians, and some nurses who had attended appellant in an effort to make the case as forceful as possible. He was trying to establish total and permanent disability, and these witnesses, or some of them, did say that appellant was totally disabled from engaging in gainful occupation, and that there was a lack of coordination in speech and thought; which might be permanent; yet there is a lack of evidence to establish the fact that appellant was at the time of the transaction mentally incompetent. Some proof of this character did appear in the record, but came in after the transactions in question, and after the filing of the instant suit. The fact that the Nelson court had adjudged in 1935 that appellant was incompetent, and of unsound mind since 1927 had no bearing on the question as to whether appellee knew or should have known that she was incompetent, and the trial court correctly excluded the documentary proof, 32 C. J. 647; Huffaker v. Brammer, 193 Ky. 267, 235 S. W. 727; Rath's Committee v. Smith, 180 Ky. 326, 202 S. W. 501.

Where a person has not theretofore been adjudged mentally unsound, a transaction sought to be annulled with such person will not be voided unless the condition be so obvious that any and all ordinarily prudent minded persons would observe the defect. "But if the degree or extent * * * is such only that ordinarily prudent minded people will differ * * * and the transaction is in good faith and no undue advantage or fraud be shown, such transaction will not be interrupted by the courts; and this rule prevails in some instances, even though the person has been previously adjudged insane, depending upon the evidence in each case." Cummins' Adm'r v. Walker's Committee, 252 Ky. 5, 66 S. W. 2d 48, 50; Rath's Committee v. Smith, 180 Ky. 326, 202 S. W. 501; Fitzpatrick's Adm'r v. Citizens' Bank & Trust Co., 231 Ky. 202, 21 S. W. 2d 254; Hager v. Pacific M. L. Ins. Co., D. C., 43 F. Supp. 22; Transylvania University v. McDonald's Ex'r, 277 Ky. 608, 126 S. W. 2d 1117. These cases hold the burden to be upon the one seeking to avoid the transaction; we are of the opinion that appellant did not sustain the burden.

The case comes down finally to the proposition that appellee recommended, and appellant bought speculative stocks, and held them until a time when her investment practically vanished. The general rule is that expressions of opinion do not constitute a fraud. There was neither plead nor shown intention to deceive or defraud; nothing that could in any way redound to the financial benefit of appellee. As said, the utmost that could be said of the relationship is that appellee was acting as agent, and if that status could be said to have existed, then our opinion in Reily v. Fleece, 259 Ky. 330, 82 S. W. 2d 341, is conclusive. Fleece, an attorney, held a power of attorney from Lucy Reily, authorizing him to invest and reinvest her funds. He bought stocks which declined to half their value, and the plaintiff sued to recover the loss, basing her action on negligence in buying the securities at a value in excess of market prices; failure to invest in securities named in section 4706, KS. This court found that Fleece had bought from a licensed broker of high standing, and was not to be held negligent; that Fleece did not come within the class required to invest under the above section of the statute. This case, of course, was free of the element of disability or knowledge of disability, a matter already disposed of. While the facts are not precisely similar

in Armstrong v. Citizens Union National Bank, 269 Ky. 171, 106 S. W. 2d 630, 113 A. L. R. 244, where a person bought bonds at the recommendation of the cashier, and the value declined during the 1929 depression, and suit was brought to recover the loss, the court suggested that there was a lack of evidence to show that the bonds were not good when purchased in 1927, and the fact that they declined later did not lead to the conclusion that they were worthless at the time of purchase.

There is much complaint of the court's action in excluding some testimony offered by appellant, some, if not all, of which consisted of statements and depositions of physicians based upon letters and depositions. In these, or some of them, the appellant endeavored to prove by the witnesses a condition based on the opinion or statement of doctors, none of whom were introduced; some of these were taken in the suit in 1934, and others in preparation of the suit against the railroad company. These depositions were not offered in such manner as to constitute competent evidence. Even had they been they would not have thrown light on the main issue here, that is, whether or not the mental disability of appellant was so obvious as to put appellee on notice. The depositions do not go to this extent.

We agree with the trial court that the whole case presents an unfortunate situation; he no doubt, as we have endeavored to do, gave careful consideration, and we are compelled to hold that the court correctly directed a verdict favorable to appellee.

Judgment affirmed.