**Joe Paul HALL, Appellant,**

v.

**Bernice Hall CROUCH, John Robert Hall and R. N. Taylor, Appellees.**

Court of Appeals of Kentucky.

June 3, 1960.

Rehearing Denied Jan. 20, 1961.

Tilford & Dobbins, Stuart E. Alexander, Woolsey M. Caye, Louisville, for appellant.

William G. Reed, Carrollton, F. S. Connely, Warsaw, for appellees.

STEWART, Judge.

This appeal is from the judgment which determined John C. Hall, now deceased,

had sufficient mental capacity to execute the two instruments hereinafter mentioned. As an incidence the correctness of the findings of fact of the trial judge is also challenged. We shall herein refer to the decedent as "Hall." R. N. Taylor is a nominal party in this appeal, and when we use the word appellee or appellees no reference is intended to him.

Hall was a rural mail carrier making deliveries out of the Glencoe post office in Gallatin County until he retired in the early 40's. He amassed an estate of an estimated gross value of around $50,000, consisting of a farm at Glencoe of approximately 100 acres, $6000 in bonds, and some cash and other varied assets. He was married twice. As a result of his first marriage, two children were born, Bernice Hall Crouch and John Robert Hall, appellees herein. His second wife, Mattie, became the mother of Joe Paul Hall, appellant herein.

In the fall of 1955, Hall began to exhibit a type of conduct that indicated he was suffering from some kind of mental disturbance. His condition did not improve and on April 17, 1956, he was taken to Covington and examined by Dr. Thomas Weldon, a psychiatrist, and on the next day was admitted to the psychiatric ward of the St. Elizabeth Hospital in that city for treatment. He was kept in this institution almost a month.

On May 16, 1956, upon application of his wife, Mattie, a lunacy inquest was held in the Gallatin County Court. As a consequence of this proceeding Hall was adjudged to be an insane person and was ordered committed to Central State Hospital at Lakeland, a state-supported asylum for the treatment of lunatics. He was confined in this institution until the following November 6th, at which time he was released to the care of his brother at Warsaw. Four days thereafter, at a trial held for the purpose, he was adjudged restored to his sanity, but no medical evidence was introduced at this hearing.

On January 10, 1957, he was found wandering around in the rain between Glencoe and Warsaw, apparently lost, and, upon the advice of a local physician, was sent back to the St. Elizabeth Hospital where Dr. Weldon began treating him again. He remained in this hospital as a patient of this specialist until February 11, 1957, when he was permitted to come to Warsaw. He never returned to the St. Elizabeth Hospital but instead was placed in a rest home at Dry Ridge where aged people are cared for. While an inmate at this home he died September 10, 1957.

After the restoration proceeding on November 10, 1956, and prior to February 2, 1957, his wife, Mattie, instituted an action against him for divorce and for a property settlement. On the latter date he entered into an agreement whereby he bestowed upon his wife ownership of approximately one-third of his estate. Subsequent to the settlement agreement, and while he was still a patient in the rest home, he wrote a letter on March 6, 1957, to William G. Reed, his attorney who had handled his divorce action, directing him to prepare a conveyance of his 100-acre tract of land to appellees, his children by his first wife. This communication also recited that he should retain a life interest in the property when the instrument was prepared.

On March 16, 1957, a deed, drawn up in the manner outlined, was signed and acknowledged by him. Later, on July 13, 1957, he executed a trust agreement to Bernice Hall Crouch, as trustee, by the terms of which the income from certain property embraced therein was directed to be distributed in accordance with a specified plan (that we need not consider) and the corpus of the trust at his death was ordered to be equally divided between appellees. He was 74 years old at the time.

It is the contention of appellant that Hall was without mental capacity to know the effects of his acts when he executed these two instruments. We must look to the

evidence, and particularly the medical proof, to determine this point.

Dr. Thomas A. Weldon, the psychiatrist who treated Hall in Covington, perhaps had the most intimate knowledge of his mental disturbance from its incipience until the date he passed away. He diagnosed Hall as suffering from cerebral arteriosclerosis (hardening of the arteries in the brain); he also stated Hall had "paranoiac trends" and showed indications of "senility psychosis." At the outset, Hall manifested such mental symptoms as forgetfulness and poor judgment, and such emotional instability as being restless, confused and worried. It was brought out that he was irresponsible as regards his property, as shown by the fact that he could be easily persuaded to give away sizable sums of money, even to strangers. It will be recalled Dr. Weldon treated him from April 17th to May 16, 1956, and from January 10th to February 11, 1957. He was also called to the rest home to see Hall on August 14, 1957.

Dr. Weldon was asked whether Hall had sufficient mental capacity to understand the nature of his estate and to engage in a legal transaction on February 11, 1957, when Hall left his care at the hospital, and also on August 14, 1957, when he last visited Hall at the rest home. As to Hall's ability to manage his affairs on the first date, Dr. Weldon's response was that there would be a question in his mind "whether he (Hall) should get into too involved a situation"; and, as to Hall's mental competence to take care of his business on August 14, 1957, it was his view that he definitely did not have such capacity at that time. Dr. Weldon also expressed the opinion Hall should not have been restored to his sanity by court action on November 10, 1956.

After Hall was transferred from the St. Elizabeth Hospital to the nursing home at Dry Ridge, he was seen professionally two times by Dr. John Gunn and three times by Dr. Claude G. Waldrop. Both of these doctors are general practitioners in Williamstown. Dr. Gunn saw Hall on February 15th and on August 20, 1957. On his first visit to Hall, he said the latter was so "dazed and confused" he was unable to reply to any inquiries directed to him. Dr. Gunn stated that, when he saw him on August 20th, Hall was lying on his back in bed, with his jaws fixed, his body twitching and jerking, and that he would make no response when questioned, although he apparently was conscious.

On July 11th, July 19th and August 8, 1957, Dr. Waldrop was called to treat Hall and his description of the patient's condition and behavior was substantially similar to Dr. Gunn's statement as to how Hall looked and acted on August 20, 1957. Dr. Waldrop was also of the opinion, in summing up the impression he derived from his first visit and also from his two following visits, that Hall was a mental case and had been such even before he was sent to the rest home.

The rest home at Dry Ridge kept records as a part of the regular course of business in which contemporaneous entries were made of "unusual occurrences of patients." These records revealed Hall was placed in the rest home on February 11, 1957, by his daughter, Bernice Hall Crouch, one of the appellees. At that time his prescribed medication was 25 milligrams of thorazine three times daily to keep him calm which, according to the testimony of Geneva Gordon, a nurse at the rest home, "wasn't enough." A significant entry was made in the rest home records on March 16, 1957, as brought out by the testimony of this same witness. This disclosed Hall was administered a dose of phenobarbital on that date, which drug had been ordered to be given when the ordinary daily dosage of thorazine was insufficient to induce calmness. It will be recalled this was the same day Hall executed the deed to appellees.

T. W. Collins, a retired farmer who lives at Glencoe, testified that he had known Hall for forty of forty-five years; and that

he served as committee for him during the time he was placed in Central State Hospital. Collins testified that after Hall's release from that hospital he seemed to be very nervous and was not normal, and that he understood only part of what was said to him.

The trial judge in his findings of fact placed much emphasis upon four letters that were proven to be in Hall's handwriting and which were made a part of the record. He believed these communications disclosed Hall was in full possession of his faculties on the occasions he executed the two instruments that are the subject of this litigation. Two of these letters were undated; one dated December 5, 1956, pertained to the divorce then pending between Hall and his wife, Mattie; and the other, which we have already alluded to and which was dated March 6, 1957, was addressed to his attorney, and this contained directions about the conveyance of his land at Glencoe to appellees.

A second factor the trial judge believed important was a remark Hall made to his brother, Louis L. Hall, while he was making his home with him, as to his intentions with reference to the ultimate disposal of his property. It will be remembered Hall had, along about this time, consummated a property settlement with his wife in which he had transferred about one-third of his estate to her. Louis L. Hall was asked this question regarding his brother: "Then, following his divorce action, did you hear him make any statement concerning his estate?" He answered: "Well, he said he figured in the settlement that his wife had got her part and for the boy (Joe Paul Hall). And, the rest should go to his two first children, by his first wife. Now, that's what he said." Hall lived with his brother from November 6, 1956, until January 10, 1957.

The trial judge reasoned that, when Hall later carried out his expressed intention as to the final disposition of his property by executing the deed on March 16th

and the trust agreement on July 13, 1957, this consummation of a fixed plan indicated he was sane on these dates. We believe the evidence revealed he was incompetent to transact a business deal on each of these dates.

We are aware of the well-established rule that "unsoundness of mind to avoid a contract must relate to the immediate time when the contract was made." The quoted portion of his sentence appears in Jefferson Standard Life Insurance Company v. Cheek's Adm'r, 258 Ky. 621, 80 S.W.2d 518, a case cited by appellees. Another well known rule is that the courts will look only to the adequacy of the understanding where the validity of an act is questioned, and neither age, sickness, extreme distress, or debility of the body will affect the capacity to make a contract or conveyance, if sufficient intelligence remains to understand the transaction. See Chrisman v. Quick, 174 Ky. 845, 193 S.W. 13.

Let us now consider the rules we have mentioned in their relation to the facts of this case, because these principles of law appear to us to govern our decision in this litigation.

The trial judge in his findings of fact made no effort to evaluate the medical evidence introduced, as it bore upon Hall's mental stability. In fact, this line of testimony was produced wholly by appellant's witnesses and stands uncontradicted in the record. We believe the great weight of this proof conclusively showed Hall to be a mentally deranged person throughout their contact with him. From the time he was first placed in the psychiatric ward at the St. Elizabeth Hospital on April 17, 1956, until the day he finally died on September 10, 1957, an analysis of the proof of the doctors in this case indicates Hall's mind did not mend but, on the contrary, grew progressively worse.

Admittedly, persons afflicted with the same malady with which Hall was suffer-

ing have lucid periods from time to time during which they are able to conduct themselves in a normal manner. However, the record before us refutes the idea that he was in a rational state of mind on March 16, 1957, or on July 13, 1957, when the evidence is pinpointed to these two dates. On the first date, when the deed was signed and acknowledged by him, he was under heavy sedation, since it was disclosed he had then been given not only thorazine but phenobarbital. When we consider Hall was already in a subnormal state of mind, the taking of these drugs over a protracted period of time, as was done by him, would tend to reduce him to a comatose condition. The letter of March 6th, relied upon by the trial judge as indicative of Hall's mental competence on March 16th, must yield to the cold fact that he was in bad shape mentally and emotionally on the latter date, as established by the undisputed evidence of Geneva Gordon, the nurse at the rest home.

As to the July-13th date, when the trust agreement was executed, the professional visits of Dr. Waldrop to Hall, a few days before and a few days after this date, constrain one to believe his distraught condition had become a fixation. At this time, as heretofore mentioned, Hall would lie on his bed, with his teeth clenched tight and his jaws held rigid and refuse to talk. Such manifestations appeared to have become so definite a pattern of behavior upon his part that by no stretch of the imagination could it be said he was then a rational person.

We therefore conclude the uncontroverted evidence in this case clearly demonstrated that Hall could not have known or understood the import of what he was doing on March 16th or July 13, 1957, when the two instruments under discussion were executed by him. Here was a man whose whole background was clouded by insanity from April 17, 1956, until the day he died; and his mind did not mend but grew progressively worse. It follows that the findings of fact of the trial judge were clearly erroneous (see CR 52.01), and that the deed of March 16, 1957, and the trust agreement of July 13, 1957, are void and should be set aside.

Wherefore, the judgment is reversed.

PALMORE, Judge (dissenting).

I respectfully dissent from this opinion for the following reasons: The burden of proof was on the appellant to overcome the presumption that John C. Hall's mind was lucid at the specific times of his execution of the two instruments. He did not produce a single witness to the execution of either document, nor did any of the medical witnesses testify directly that Hall was not or could not have been mentally competent on March 16 and July 13, 1957. The letters introduced in evidence, particularly the one dated March 6, 1957, show quite clearly that there were times when he was competent. Although the evidence of incompetence may have preponderated, I cannot agree with the majority opinion that it was conclusive as a matter of law.