ACREE, JUDGE:
Appellant, Estate of Geneva Adams, by and through her personal representative, Sharon Mitchell, appeals the Hopkins Circuit Court's January 17, 2017 Order granting the motion of Appellees, Phillip C. Trover, M.D., and Trover Clinic Foundation, Inc. d/b/a Baptist Health Madisonville, to enforce a settlement agreement executed by Geneva Adams prior to her death. For the following reasons, we affirm.
BACKGROUND
As Appellee notes, this case has a long and complex procedural history, beginning as an effort to certify a class of more than four dozen plaintiffs to pursue claims against the Appellees. This is the second appeal of this particular case by these specific parties. For an in-depth discussion of the common background giving rise to the proposed class action, see Estate of Crutcher by and through Qualls v. Trover , 2012-CA-001841-MR, 2016 WL 106283 (Ky. App. Jan. 8, 2016), review denied (June 8, 2016). For the full background of this Appellant's first appeal, see Estate of Adams v. Trover , 2012-CA-001877-MR, 2016 WL 100297 (Ky. App. Jan. 8, 2016).
The relevant facts of this second appeal are as follows.
Geneva Adams was born December 3, 1942. In May 2001, she was diagnosed with breast cancer ; that cancer later metastasized to her shoulder. Dr. Trover participated in her treatment, having read a March 10, 2000 mammogram, a July 18, 2003 nuclear scan, and August 20, 2003 MRIs of her cervical and lumbar spine.
Coincident to the events specific to Geneva, an oncologist familiar with and reliant upon Dr. Trover's practice became concerned that his body of work as a whole was substandard. The oncologist reported his concerns to his superiors and the matter was referred for investigation to the Foundation's Medical Executive Committee.
Before the Committee's investigation was complete, the concerns about Dr. Trover became the subject of news reports. Geneva learned of these news reports and, in March 2004, asked medical personnel at the Foundation "to have some of [her] films reread." (Geneva Adams Dep., Sept. 29, 2005, p. 54).
*549 The following month, on April 20, 2004, the Medical Executive Committee issued a report outlining its findings and concluding that Dr. Trover's rate of error when interpreting mammographic slides was "unacceptable." That same month, Dr. Trover resigned and relocated to Michigan to practice medicine.
After that report became public, discussions began between Geneva and a representative of the Foundation, Karen Renfro. The record does not reveal who initiated the contact; Renfro cannot recall who contacted whom first. (Karen Renfro Dep., Dec. 19, 2007, p. 18). Geneva never was asked whether she recalled. However, according to Renfro, Geneva "was making an allegation that there was negligence or malpractice ... I don't know what word she, you know, used." (Id. at p. 20). Before the middle of June, Geneva and Renfro met at least two and, perhaps, three times. (Id. at pp. 30, 32). They discussed Geneva's potential claim and how to resolve it. Renfro had also contacted the Foundation's legal counsel.
About that time, on advice of legal counsel, Renfro asked Geneva if she would agree to be evaluated by a physician of her choice before she executed any release. Geneva agreed and selected as her evaluator Dr. Kenneth Hargrove, a physician she had last seen in December 2002.
Renfro made the initial contact with Dr. Hargrove, but she did not direct him in any way. He was not paid directly; the Foundation paid Multicare Specialists, PSC, Dr. Hargrove's employer, for his evaluation of Geneva.
Dr. Hargrove examined Geneva on June 17, 2004, and then wrote to Renfro with his results. He began by noting Geneva's history of breast cancer and mastectomy about two years earlier. Then, he described the purpose for his evaluation, before getting to the evaluation itself:
She subsequently had metastatic disease to the right shoulder. There is a question as to the time required to diagnose that and she is working with the [Foundation] for an evaluation settlement. I was asked to evaluate whether I thought she was competent to make any financial decisions.
Other than a breast cancer this is a fairly healthy lady....
[She said] she never gets lost. She still drives.... [and] goes everywhere she wants.... She does not do her taxes. She sends those to H & R Block but otherwise takes care of all of her financial cares. She takes care of her own house and does her own housework, her own cooking and cleaning and laundry and has no problems doing so.
....
Her mental status is normal. She has good insight to what is going on and I think she is capable of making any financial decisions and settlements.
She understands that these will be difficult decisions but she is as capable as anyone of making those difficult decisions....
(R. 63-64). In his cover letter to this evaluation, he said: "It is understood that th[ese] would be very difficult decisions to make and people will agree or disagree with her decisions but she will be capable of making them as well as anyone." (R. 62). When asked whether she agreed with Dr. Hargrove's statement, Geneva said, "I agree." (Adams Dep., p. 52).
The record shows that Geneva actively participated in negotiations. Three times in her deposition she said she negotiated the settlement amount.
Counsel: [Y]ou understood and you negotiated the price of-for the settlement being $50,000; isn't that right?
Geneva: Yes.
*550 Counsel: And that was something that you arrived at yourself, correct?
Geneva: Uh-huh.
(Id. at p. 57). And, again, when asked, "Did you and Karen negotiate about the price of the-the release[,]" she said, "Yeah." (Id. at p. 58).
She also negotiated the timing of the payment. As is shown in the agreement itself and confirmed in her deposition (id. at p. 53), Geneva required that payment be delayed until December 4, 2004. This was the day after Geneva would turn 62 years of age.
Furthermore, apparently because of the delay between the execution of the release and the date of the payment, Geneva "was concerned that should something happen to her, that her children would not receive whatever sum we had agreed upon." (Renfro Dep., p. 41). Renfro contacted legal counsel, conveying that concern, and language was added to the release that "this agreement survives the death of the claimant, and in that event, said sum will be paid pursuant to KRS 411.130[1 ] or by claimant's prior direction." (R. 1567).
Once the release was drafted, Renfro gave Geneva a copy to review. (Renfro Dep., p. 35). Geneva took the draft home and consulted with her landlord, Carolyn Clayton. Geneva had sought Clayton's advice before. Clayton believed that $50,000 was an insufficient settlement amount and asked Geneva why she would settle for this amount. Geneva said Renfro told her that "if she didn't and 'got into a lawsuit' with the Foundation, that she would not get treated for her cancer." (Affidavit of Carolyn Clayton, R. 1562). Together, Geneva and Clayton returned to the Foundation to see Renfro at which time Clayton expressed her view that the settlement amount was too low. Clayton suggested a settlement of $170,000 to $175,000. (G. Adams Dep., Sept. 29, 2005, p. 59). Renfro did not offer more money, stating that the Foundation did not cause Geneva's cancer and that, "in the event Geneva did not take the offer of the Foundation ... 'that it [the Foundation] had the option of not treating Geneva' "; Clayton perceived this as a threat. (Clayton Affidavit; R. 1563).
On August 24, 2004, the discussions culminated in Geneva's decision to execute the "Full and Final Release of All Claims" in consideration of the Foundation's $50,000 payment. Geneva received the $50,000 check according to the terms she had negotiated. However, she said, "I couldn't keep it, though [because it was] messing up on my food stamps and my supplemental income." (Adams Dep., p. 53).
Geneva then consulted legal counsel and instructed him to return the uncashed check to the Foundation. Her counsel followed her instructions and he returned the check on December 28, 2004. The attorney's transmittal letter stated that "Ms. Adams does not believe a legal and binding agreement has been reached with the Trover Foundation for the settlement of her claims." (R. 377). Geneva then filed this lawsuit.
The procedural detours between then and now are of little significance to this review. Sadly, however, six years after signing the release, Geneva lost her battle with cancer and died in June 2010.
In September 2016, Appellees filed a Motion to Enforce the Settlement Agreement. The circuit court heard the arguments *551 of counsel in open court in December 2016. On January 17, 2017, it entered an order granting Appellees' motion. From that order, the Appellant brings this appeal.
APPELLANT'S ARGUMENTS
Under the umbrella argument that a contracting party's intent and capacity is a jury question, Appellant makes four specific arguments: (1) Geneva signed the release under duress; (2) the release was not supported by valuable consideration; (3) Geneva did not have the mental capacity to execute the release; and (4) Geneva did not understand the subject matter of what she was releasing.
STANDARD OF REVIEW
Appellees state the standard of review as follows: "[a]n agreement to settle legal claims is essentially a contract subject to the rules of contract interpretation" and contract interpretation is a legal question for the court. Cantrell Supply, Inc. v. Liberty Mut. Ins. Co. , 94 S.W.3d 381, 384 (Ky. App. 2002).
Appellant implies that the standard of review is the same in this case as if the order from which the appeal is taken was a summary judgment. The standard of review on appeal of a summary judgment is whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law. Kentucky Rules of Civil Procedure (CR) 56.03. "The record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." Steelvest, Inc. v. Scansteel Service Center, Inc., 807 S.W.2d 476, 480 (Ky. 1991). Summary "judgment is only proper where the movant shows that the adverse party could not prevail under any circumstances." Steelvest, 807 S.W.2d at 480 (citing Paintsville Hospital Co. v. Rose, 683 S.W.2d 255 (Ky. 1985) ). Consequently, summary judgment must be granted "[o]nly when it appears impossible for the nonmoving party to produce evidence at trial warranting a judgment in his favor[.]" Huddleston v. Hughes, 843 S.W.2d 901, 903 (Ky. App. 1992) (citing Steelvest, 807 S.W.2d 476 ) (citations omitted). "Because summary judgment involves only legal questions and the existence of any disputed material issues of fact, an appellate court need not defer to the trial court's decision and will review the issue de novo. " Lewis v. B & R Corp., 56 S.W.3d 432, 436 (Ky. App. 2001) (footnote omitted).
These standards are not mutually exclusive, and we will apply both or each of them as appropriate.
ANALYSIS
1. Duress
What constitutes duress is a question of law. Crestmark Bank v. Electrolux Home Prod., Inc. , 155 F.Supp.3d 723, 744 (E.D. Mich. 2016) ("The question as to what constitutes duress is a matter of law, but whether duress exists in a particular case is a question of fact."). "The term 'duress,' as it is used by the law, means such violence or threats made by the party or some person acting for or through him, or by his advice or counsel, as are calculated to produce on a person of ordinary intelligence a just fear of great injury to person." Bond State Bank v. Vaughn , 241 Ky. 524, 44 S.W.2d 527, 528 (1931) ; see also Boatwright v. Walker , 715 S.W.2d 237, 243 (Ky. App. 1986) (quoting Bond ).
To avoid an unfavorable ruling as a matter of law, Appellant was required to present evidence that would "bring [her claim] within the definition of ... 'duress[.]' "
*552 Bond State Bank , 44 S.W.2d at 528. The evidence fails in this regard. There is no evidence that any agent of the Appellees actually injured or threatened injury to Geneva's person, at least in an ordinary sense. See Harris, Speakes & Harris v. Kreigle , 197 Ky. 50, 245 S.W. 866, 867 (1922) ("[I]f in this case [Harris, et al. ] had threatened to do [Kreigle] personal violence if he did not [agree to settle], and Kreigle was put in fear and to avoid personal violence [he settled], his case would have been made out.").
In effect, however, Appellant argues that this Court should rule that a medical provider's threat to decline treatment to a patient is the legal equivalent of a threat of physical injury. We decline to do so. "The general rule regarding duress under such circumstances is to the effect that it is not duress to threaten to do what one has a legal right to do, nor is it duress to threaten to take any measure authorized by law and the circumstances of the case." Redmon v. McDaniel , 540 S.W.2d 870, 872 (Ky. 1976). Although Appellant presented opinion evidence that, under some circumstances, declining medical care to a patient is unethical, there is no proof that doing so is unlawful. Furthermore, one of the circumstances of the case is that the Foundation is not the only facility where Geneva could be treated.
"In the absence of evidence to sustain [t]his charge of duress, we will not pursue any further the contention made on this point." Martin v. Ratliff Furniture Co. , 264 S.W.2d 273, 275 (Ky. 1954).
2. Consideration
Appellant argues that, because Geneva never cashed the $50,000 check she received, the release was not supported by consideration. To support this argument, Appellant draws from and conflates several doctrines or points of law related variously to rescission, accord and satisfaction, and the Uniform Commercial Code. We address those points below but conclude that Geneva's failure to cash the check did not defeat the consideration supporting the release.
A check "is a substitute for money which is commonly and generally used ... in legal proceedings and may be considered as so much money." McGregor v. Mills , 280 S.W.2d 161, 163 (Ky. 1955). And so it is, in this case, the equivalent of cash. McGregor also states the rule that before a party may sue to rescind a settlement and release of a claim, "he must return or tender a return of the sum received by him in the settlement." Id. at 162-63. That was the only legal significance of Geneva's return of the uncashed check. Without a return of the consideration, none of Appellant's theories for voiding the release could be entertained. Baker's Adm'x v. Louisville & N.R. Co. , 287 Ky. 13, 152 S.W.2d 276, 277 (1941) ("The party seeking to avoid the compromise settlement should allege the return or tender of return of consideration received, and in the absence of such an allegation the plea of compromise and settlement contained in the answer is a good defense.").
Appellant faults Appellees for pleading accord and satisfaction only in general and not specifically. However, CR 8.03 requires no more than that the defenses enumerated-including accord and satisfaction-be pleaded generally. Although pleading special matters in defense of a claim requires greater specificity, as expressly stated in CR 9.01 to CR 9.06, accord and satisfaction is not among those special matters.
Appellant also argues that a statute of the Kentucky Uniform Commercial Code, Kentucky Revised Statute (KRS) 355.3-311, governs this case. We do not agree. That statute is entitled "Accord and *553 satisfaction by use of instrument " and its title indicates its purpose. (Emphasis added). "[T]he Drafters proposed ... UCC § 3-311, to govern situations where the tender of a negotiable instrument attempts an accord and satisfaction." Morgan v. Crawford , 106 S.W.3d 480, 481 (Ky. App. 2003). This common scenario predates the UCC, as shown in Alcorn v. Arthur , 230 Ky. 509, 20 S.W.2d 276 (1929).
In Alcorn , the Court described the scenario, as follows:
When a claim is in dispute and the debtor sends to his creditor a check or other remittance which he clearly states is in full payment of the claim and the creditor accepts the remittance or collects the check without objection it is generally recognized that this will constitute a good accord and satisfaction. * * * And when a check is sent upon the condition that it be accepted in full payment of a disputed claim, there is, as a general rule, but one of two courses open to the creditor, either to decline the offer and return the check or to accept it with the condition attached. The moment the creditor indorses and collects the check, knowing it was offered only upon condition, he thereby agrees to the condition and is estopped from denying such agreement. It is then that the minds of the parties meet and the contract of accord and satisfaction becomes complete. That rule is correct.
Alcorn v. Arthur , 230 Ky. 509, 20 S.W.2d 276, 277 (1929) (citation and internal quotation marks omitted).
In the fact pattern contemplated by KRS 355.3-311, and the common law it codified, there is no underlying agreement to settle the disputed claim. This is because, under KRS 355.3-311, the underlying claim must remain unliquidated. KRS 355.3-311(1)(b). Sending the check itself is the ploy or the bait to encourage the recipient's agreement to compromise the dispute. In other words, under KRS 355.3-311, the check itself is the first party's offer of dispute resolution, and negotiation of the check is the second party's acceptance of that offer. If this occurs, the effect is to liquidate the previously unliquidated claim.
On the other hand, when parties, disputing an unliquidated claim, enter into a separate, independent agreement compromising their positions and settling on a specified sum to resolve the conflict, the amount in dispute is no longer unliquidated. In this case, the August 24, 2004 agreement releasing Geneva's claims against the Appellees had the effect of liquidating the disputed claim in the amount of $50,000 in damages. The damages Geneva might have claimed in a tort action were compromised under the release at $50,000, a liquidated sum. That makes KRS 355.3-311 inapplicable. Id. The Appellees were not attempting an accord and satisfaction by use of an instrument, i.e., a check , as KRS 355.3-311 contemplates. The accord and satisfaction had occurred previously by negotiation and settlement as memorialized in the August 24, 2004 release.
Regarding, generally, the concept of accord and satisfaction, our courts have long held that "if the liability contended for is doubtful ... a compromise or settlement of it for a less sum than what would be due if no such doubt existed ... will be upheld as having been made upon a valid and sufficient consideration." Mutual Ben. Health & Acc. Ass'n of Omaha, Neb. v. Kidd , 259 Ky. 261, 82 S.W.2d 312, 314 (1935). That describes the facts of this case.
Lack of consideration is not a ground for reversing the circuit court.
3. Capacity *554 As with duress, what constitutes capacity to contract is a question of law. Cecil's Ex'rs v. Anhier , 176 Ky. 198, 195 S.W. 837, 844 (1917). When courts are asked to enforce a contract, the starting point is this: "[T]here is always the presumption of sanity and capacity to contract[.]" Holcomb v. Brashears , 273 S.W.2d 810, 811 (Ky. 1954). There is special significance in the fact that this issue begins with a presumption. When faced with a presumption, "the party against whom it operates [is required] to introduce evidence to rebut it. If this burden of going forward is not satisfied," the circuit court may properly decide the question as a matter of law. Rentschler v. Lewis , 33 S.W.3d 518, 520-21 (Ky. 2000).
The sufficiency of that rebuttal evidence depends on the presumption. In the case of the presumption of capacity, every contracting party "must be treated as ... of sound mind until the contrary is shown by clear and convincing evidence. " Rath's Committee v. Smith , 180 Ky. 326, 202 S.W. 501, 503 (1918) (emphasis added). Even considering the record in a light most favorable to Appellant, we agree with the circuit court that Appellant failed to identify clear and convincing evidence sufficient to overcome the presumption of Geneva's capacity and so no jury question was created. Our conclusion is bolstered by numerous cases, cases that approach the question from a variety of angles.
"Where a person has not theretofore been adjudged mentally unsound, a transaction sought to be annulled with such person will not be voided unless the condition be so obvious that any and all ordinarily prudent minded persons would observe the defect." Everett v. Downing , 298 Ky. 195, 203, 182 S.W.2d 232, 236 (1944). Geneva was never adjudicated to be of unsound mind. Therefore, we look to Appellant's proof that on August 24, 2004, Geneva's lack of capacity was "so obvious that any and all ordinarily prudent minded persons would observe the defect." Id.
Appellant presents evidence that Geneva's intellectual quotient was low, that she failed three grades, and that she only advanced in her schooling to the eighth grade. However, "mental weakness alone does not justify the annulment of a contract or deed if it is not such an infirmity as to destroy the party's power to act voluntarily and to appraise the consequences of his act...." Caldwell v. Hatcher , 248 S.W.2d 892, 894 (Ky. 1952). The law requires only that "sufficient intelligence remains to understand the transaction." Hall v. Crouch , 341 S.W.2d 591, 594 (Ky. 1960) (citation omitted). The evidence shows Geneva understood the release, its purpose, and its effect.
Even before Renfro contacted her, Geneva was aware of the controversy surrounding Dr. Trover and had the soundness of mind to ask for rereads of her radiological films. During the months of discussion preceding her execution of the release, Geneva made allegations that Dr. Trover's misreads delayed the diagnosis of her metastatic bone cancer. She negotiated terms with Renfro to compromise her claim, starting with the settlement amount of $50,000.
Before signing, she took the document home and consulted with Clayton, then returned with Clayton to Renfro's office to attempt further negotiation of the settlement amount. Geneva demanded and Renfro agreed to a four-month delay in payment as one of the release terms. She asked for and obtained language in the release that her children would receive the benefit of her settlement should she die before receipt. She had sufficient cognitive wherewithal to recognize the settlement was going to affect her government entitlements.
*555 We conclude that the undisputed proof of Geneva's conduct leading up to her execution of the release, and thereafter, demonstrates she understood the release, its purpose, and its effect.
Appellant also brings our attention to proof of Geneva's limited "abstract reasoning abilities." But such evidence falls far short of the legal requirement for setting aside her release. The release was not drafted in a way that it could only be understood by application of abstract reasoning. It is a simple, short document. Proof of a lack of higher thought processes has little, if any, bearing on the issue of Geneva's capacity. The proof Appellant needed to present, but did not, is that "the mind of [Geneva] was of such a character that [s]he had no reasonable perception or understanding of [the release's] nature and could not appreciate the probable consequences upon h[er] rights and interests." Conservative Life Ins. Co. v. Hutchinson , 244 Ky. 746, 52 S.W.2d 709, 711 (1932). "There must be some direct proof sufficient to convince the minds of the court that at the time the transactions were entered into that [s]he did not and could not understand h[er] acts." Revlett v. Revlett , 274 Ky. 176, 118 S.W.2d 150, 155 (1938). No such proof is in this record.
Appellant's evidence of Geneva's age and illness, and of the mental stress of dealing with her cancer, is insufficient proof to defeat the presumption of her capacity because, as has been said more than once, "neither age, sickness, extreme distress, or debility of the body will affect the capacity to make a contract or conveyance, if sufficient intelligence remains to understand the transaction." Hall v. Crouch , 341 S.W.2d 591, 594 (Ky. 1960). All the evidence supports but one conclusion: Geneva remained possessed of sufficient intelligence to understand this transaction.
Our high court has expressed the same concept in a variety of ways, including in the case of Collins v. Isaacs , 231 Ky. 377, 21 S.W.2d 484 (1929), where it is said:
However much his mental faculties may be impaired, or however low his natural endowment of intelligence, if he possesses the mental capacity to understand in a reasonable manner the nature and consequences of the transaction before him, and to exercise a reasonable measure of judgment and choice in regard to it, he is sane, quoad hoc, and must be held bound by what he has done.
Collins , 21 S.W.2d at 486. Collins' infirmities far exceeded Geneva's. Id. at 484-85 (limited education, two strokes, motor aphasia, loss of ability to write, impaired powers of speech limiting his vocabulary to about five words, etc.). These substantial defects were not enough to destroy Collins' capacity to contract. Geneva's condition of mind and body were far from what Collins suffered and were simply not enough to rebut the presumption of her capacity.
All in all, this record does not create a genuine issue regarding Geneva's capacity to enter into or understand this two-page release. The proof in this record fails to approach the clear and convincing evidence necessary to overcome the presumption that Geneva had the capacity to execute the release.
4. Subject matter of release
Appellant argues that at no time during the negotiation of the release did Karen Renfro discuss with Geneva any of Dr. Trover's misreads of Geneva's radiological films. Because of this, argues the Appellant, Geneva did not "know that of what she is releasing." (Appellant's Brief, p. 15). This argument is not persuasive.
Geneva had only one potential claim, although the claim was against multiple parties in the Appellees. Dr. Hargrove expressed that claim in plain language when he said Geneva "subsequently had metastatic disease to the right shoulder [and *556 that t]here is a question as to the time required to diagnose that and she is working with the [Foundation] for an evaluation settlement." (R. 63). It is obvious from the record that this is also how Geneva understood her claim and what she was releasing-a claim for failure to timely diagnose metastatic bone cancer. Her awareness of that claim preceded both her engagement of legal counsel and her discussions with Renfro. There is no evidence that Geneva was unaware of the basis of her potential claim.
This subject matter is accurately reflected in the release and is expressed, not in abstract terms, but in plain language that Geneva had a hand in crafting. It is contained in a single page, with signature lines on the second page. In bold and extra-large type it says the document is a "Full and Final Release of All Claims"; within the body, it states Geneva is releasing "all actions, claims and demands whatsoever, that may now exist or hereafter accrue against Trover [Clinic] Foundation, any of it's [sic] entities or it's [sic] employees ... for failure to diagnose metastatic bone cancer...." (R. 1567).
Appellant's final argument fails to present any basis for reversing the circuit court.
CONCLUSION
For the foregoing reasons, we AFFIRM the Hopkins Circuit Court's January 17, 2017 Order granting the motion of Appellees, Phillip C. Trover, M.D., and Trover Clinic Foundation, Inc. d/b/a Baptist Health Madisonville, to enforce a settlement agreement executed by Geneva Adams prior to her death.
ALL CONCUR.

Kentucky Revised Statute (KRS) 411.130 is captioned: "Action for wrongful death; personal representative to prosecute; distribution of amount recovered." Subsection (2) provides how the money is to be distributed "to the kindred of the deceased" depending on which relatives survive the decedent.